BOUDIN, Chief Judge.
In 1995, Ernesto Cirilo-Muñoz (“Cirilo”) was convicted of aiding and abetting, during the commission of a drug crime, the murder of an on-duty policeman. This court affirmed the conviction. United States v. Mangual-Corchado, 139 F.3d 34 (1st Cir.1998). Cirilo thereafter sought relief under 28 U.S.C. § 2255 (2000), which was denied by the district court, and now seeks review in this court, attacking his sentence based on ineffective assistance of counsel and under Blakely v. Washington, — U.S. -, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), and United States v. Booker, - U.S. -, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).
Our-earlier opinion sets forth’the facts in detail but, in substance, the following is what occurred. Jose Lugo-Sanchez (“Lugo”), Saul Mangual-Corchado (“Man-gual”) and David Silva worked regular shifts selling drugs outside Cafetín El Ideal — a retail shop where customers could also drink and play pool — in Trujillo Alto, Puerto Rico. Cirilo also frequented El Ideal and was said (by El Ideal’s owner) to be “almost always” with Mangual and Lugo, although there was no evidence that he sold drugs.
Lugo correctly suspected that one drug customer: — Agent Ivan Mejias-Hernandez (“Mejias”) — was in fact an undercover police officer. In October 1994,. one of Lugo’s suppliers ordered Lugo to kill Me-jias, and Lugo in turn told Luis Antonio Ramirez-Ynoa (“Ramirez”) of his plan. On November 1,1994, Mejias arrived at El Ideal between 10:00 a.m. and 11:00 a.m. driving a white Suzuki. At around 11:15 a.m., Lugo, called Ramirez on the phone from El Ideal, telling him to drive to El Ideal and to bring “the revolver.”[1] Ramirez arrived by 12:30 p.m. with a black Oldsmobile and a revolver.
Ten to fifteen minutes later, Cirilo arrived at El Ideal and was greeted by Lugo. Shortly thereafter, Lugo and Mejias walked to the stoop of a nearby building, where Lugo accused Mejias of being an informant. Silva and Ramirez arrived at the stoop, and Lugo walked back toward El Ideal, retrieving the revolver from the Oldsmobile and concealing it. Walking back toward El Ideal again, Lugo encountered Cirilo, Mangual and one Yito Morales, and tried unsuccessfully to incite them to “beat up” Mejias.
Then Lugo, with several others (possibly including Cirilo), returned to the stoop. There Lugo ordered Mejias at gunpoint to turn over the keys to the Suzuki. Ramirez and Mangual then searched the Suzuki and retrieved Mejias’ gun. Cirilo was standing “real close to the car but not searching,” just “looking”; his fingerprints were found *529 on the Suzuki, although no evidence was presented as to when he touched the car.
Mejias, escorted by Lugo, then returned to the Suzuki from the stoop and retrieved his keys. Lugo told him to get into the car and “not to come around there anymore.” However, as Mejias was about to leave, another man called “Papilin” told Lugo, “You have to take him or kill him because he might come back.” There was no direct evidence that Cirilo heard this exchange, and the evidence was unclear as to where Cirilo was standing (or where Papilin and Lugo were standing) when this command was given.
Lugo then ordered Mejias into the Suzuki, and Mangual drove the Suzuki onto the highway with Mejias and Lugo in the back seat. Shortly thereafter, Lugo shot Mejias in the abdomen and in the head. Cirilo and Ramirez followed in the Oldsmobile, with Cirilo driving, although there was no evidence as to why. Lugo later testified that he had not told Cirilo about the planned murder and that he (Lugo) had not asked that Cirilo follow.[2]
The cars stopped at a cemetery. Whether Mejias was still alive is unclear but in any event Ramirez shot Mejias twice more in the head. The men then drove in the two cars to a quarry (during the drive Cirilo ingested cocaine provided by Lugo); the Suzuki (with Mejias’ body in it) was pushed into the quarry. The men then left the quarry in the Oldsmobile driven by Cirilo. Lugo split the $240 he had taken from Mejias’ wallet with the others. Cirilo finally drove Lugo home.
Mangual, Ramirez, Lugo and Cirilo were apprehended and, in September 1995, Ciri-lo was convicted after a jury trial in federal court of aiding and abetting the murder of an on-duty law-enforcement officer during the commission of a drug offense, 21 U.S.C. § 848(e)(1)(B) (2000); 18 U.S.C. § 2 (2000). On appeal, Cirilo argued that the evidence was insufficient to establish the aiding and abetting offense but, with one judge dissenting on this issue, the conviction was affirmed. Mangual, 139 F.3d at 44^49; id. at 49-56 (McAuliffe, J., dissenting in part).
At sentencing in January 1996, the district judge found that Mejias’ killing was motivated by his status as a police officer, resulting in a three-level enhancement under the sentencing guidelines, U.S.S.G. § 3A1.2(a). This raised Cirilo’s sentencing range from about 27 to 34 years, to required life imprisonment. At sentencing Cirilo’s trial counsel objected to the enhancement, arguing that the government had not shown that Cirilo knew that Meji-as was a police officer. The issue was not raised on appeal.
On September 29, 1999, Cirilo filed a petition for post-conviction relief under 28 U.S.C. § 2255 (2000),[3] attacking his sentence in various respects. The district court denied the petition, concluding inter alia that the court at sentencing had correctly applied the enhancement and that the lawyer’s failure to raise the issue on appeal did not violate Cirilo’s constitutional rights. We granted a certificate of appeal-ability, id. § 2253(c), directed to this claim and later broadened review to encompass a Sixth Amendment claim as well.
*530 An ineffective assistance claim requires the defendant — who bears the burden of proof, Scarpa v. DuBois, 38 F.3d 1, 8-9 (1st Cir.1994) — to show (1) that counsel’s performance fell below an objective standard of reasonableness, and (2) that but for counsel’s failures, the outcome would likely have been different. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); Cofske v. United States, 290 F.3d 437, 441 (1st Cir.2002). We review the district court’s underlying factual findings for clear error, but review its ultimate legal conclusions de novo. Reyes-Vejerano v. United States, 276 F.3d 94, 97 (1st Cir.2002); Cody v. United States, 249 F.3d 47, 52 (1st Cir.2001).
Because counsel is entitled to exercise professional judgment, Cirilo must show that an attack on his sentencing enhancement on direct appeal “was so obvious and promising that no competent lawyer could have failed to pursue it.” Arroyo v. United States, 195 F.3d 54, 55 (1st Cir.1999). We believe that test is met in this instance: the enhancement, which had a dramatic effect on the sentence, rested on very thin evidence and a possible misinterpretation of the jury verdict by the district court.
During the sentencing hearing,, the judge asked (and was answered in the affirmative), “Didn’t the jury find that this victim was killed ... because he was a police officer?” Later (during a discussion of a minor-participant adjustment), Cirilo’s lawyer suggested that even though Cirilo followed in the Oldsmobile, “that doesn’t mean that [Cirilo] knew that [Lugo] was going to kill and that [Mejias] was a police officer. He may have been surprised when- — The court responded “that’s what the jury decided.”
If the district judge was referring to knowledge of Mejias’ status, this is not what the jury had decided; the court’s instructions to the jury stated that “[k]nowledge of the victim’s status as a law enforcement officer is not necessarily an element of the offense.” Although the jury was instructed that Cirilo needed to know that murder was intended, the jury was not required by the instruction to find that Cirilo knew that the victim was a police officer.[4] The distinction between levels of knowledge is a fine one but it mattered to the particular enhancement.
Whether this possible misperception affected the district judge’s ruling is unclear. In the sentencing hearing, the district judge did make a formal finding that Cirilo knew that the victim was a police officer when he (Cirilo) assisted in the venture. But there was no detailed discussion by the .district judge of the evidence on which such a finding might rest. Ordinarily it is enough that sufficient evidence exist, but in this instance the evidence is thin and the basis for the inference drawn by the district judge is not apparent to us.
The conviction itself rested on fairly limited evidence of scienter, but an inference that Cirilo was involved in the plot could be drawn from Cirilo’s presence at the scene of incitement and threat, his prints on the car, his otherwise unexplained pursuit of the Suzuki with a party to the plot, his presence when the victim was shot again and his sharing of the proceeds. Other contextual clues were the other perpetrators’ willing acceptance of Cirilo’s presence during the events leading up to Mejias’ death, and evidence of Cirilo’s indebtedness to Lugo’s supplier which may have given Cirilo a motive to assist.
*531 It is much harder, on what we can find in this record and without more explanation, to see why Cirilo should be taken to have known that the intended victim was a police officer.[5] Cirilo’s conduct and continued presence may be difficult to explain if he were not aware that Mejias would be killed; the panel that affirmed the conviction so reasoned. But even with this awareness, Cirilo might have thought that Mejias was an informant or a member of a rival drug supply organization; or Cirilo might have assisted his associates’ efforts to kill a man without knowing just why they were doing it. Had any of these been Cirilo’s motivation, the enhancement would not apply.
Although Lugo at one point testified that he suspected Mejias of being “a police officer,” he also testified that he had confronted Mejias and told him that “as far as I was concerned he was a police informant” and “a snitch,” and that he told Silva to find out if Mejias was really “a police informant or what.” Particularly if Lugo’s expressed concern was that Mejias was an informant (and not that he was an officer), it is unclear why the district judge thought that Cirilo knew or believed Meji-as was a police officer and thus that his assistance in the murder was motivated by Mejias’ official status.
The government says that the omission of the enhancement issue on direct appeal was simply a “tactical judgment.” Murchu v. United States, 926 F.2d 50, 58 (1st Cir.1991). Yet the argument would not have detracted from the evidentiary challenge to the conviction but would have built upon it. It had the further advantage of focusing on the district court’s arguable conflation of the two different scienter issues. And it represented the difference between a long jail sentence and a life sentence. One would need a potent reason for omitting the enhancement argument from the direct appeal.
Assuming that the omission of the argument was deliberate, the best one can say for counsel is this: that in some situations lawyers think — usually in error — that by omitting a good argument, they can thereby increase the chance of prevailing on a more doubtful argument directed to a more far-reaching result. However, in this instance, such a calculation would have been manifestly unreasonable under an objective standard, given the comparative strengths of the two different attacks, the opportunity to make both, and the stakes for the defendant.
The second stage of the Strickland inquiry requires a “reasonable probability that, but for counsel’s unprofessional errors, the result ... would have been different.” Epsom v. Hall, 330 F.3d 49, 53 (1st Cir.2003) (quoting Strickland, 466 U.S. at 694, 104 S.Ct. 2052) (omission in original). We think that had the enhancement issue been pressed on direct appeal, it would have altered the outcome of the appeal. This is so because of the thinness of the evidence to support the enhancement, the lack of detailed explanation for the finding of knowledge, and the court’s apparent error in relying at least in part upon the jury verdict for a finding that the jury did not visibly make.
Some errors that result in a defendant losing the benefit of his appeal may be *532 remedied by reinstating the appeal, see United States v. Torres-Otero, 232 F.3d 24, 30-32 (1st Cir.2000), but in this instance our second-stage Strickland ruling renders this interim step pointless. The government has already had its opportunity on this appeal to defend the enhancement, and we already know that our own disposition of the direct appeal would have been to remand for re-sentencing. We therefore do so now.
We have had to make our assessment of the constitutional claim based on our own unaided review of the record and without any clear understanding of the district judge’s reasoning in finding that Cirilo knew in advance of the crime that the victim was a police officer. Conceivably, on re-sentencing, the government may again urge that such knowledge existed. Without foreclosing such an argument by the government, we are highly skeptical that such a premise can be established or that a life sentence can be justified on the known facts.
Cirilo’s brief may be taken to raise a separate claim under section 2255 that his sentence should be vacated because the enhancement was supported by inadequate evidence. This issue — unlike the ineffective assistance claim covered by the certificate of appealability and the Sixth Amendment claim that we later expressly permitted Cirilo to pursue — is not properly before us as an independent claim. Further, the use of section 2255 to attack sentencing findings is, if permissible, at best limited to very unusual eases. It also is likely that on remand the issue will disappear from the case.
As part of his section 2255 petition, Ciri-lo filed a supplemental brief seeking additional review of his sentencing in light of the Supreme Court’s decision in Blakely v. Washington, — U.S. -, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), which we allowed. Cirilo urges resentencing because the jury did not find beyond a reasonable doubt that he believed that Mejias was a police officer. Blakely claims are now viewed through the lens of United States v. Booker, — U.S. -, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).
Only in limited circumstances do new rules apply to convictions that have already become final. Schriro v. Summerlin, — U.S. -, 124 S.Ct. 2519, 2522, 159 L.Ed.2d 442 (2004).[6] These exceptions include rules that “prohibit criminal punishment for certain types of primary conduct,” and those that “forbid the imposition of certain categories of punishment for particular classes of defendants.” Sepulveda v. United States, 330 F.3d 55, 59 (1st Cir.2003); see Schriro, 124 S.Ct. at 2522-23. Neither rubric describes this case.
Otherwise, new rules are applied retroactively to cases already final only if they are “watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding.” Schriro, 124 S.Ct. at 2523 (internal quotation marks omitted). Cirilo’s version of the error (under Blakely) was that the enhancement finding was made by the judge based on a preponderance of the evidence; Booker has preserved the use of judge-made findings by directing that the guidelines hereafter be treated as advisory *533 rather than mandatory guidelines. See United States v. Antonakopoulos, 399 F.3d 68, 75 (1st Cir.2005).
In our view, the use of judge-made findings at sentencing does not undermine “accuracy” (in terms of substantially different outcomes) or undermine fundamental fairness. Such judge-made findings have been the conventional practice throughout our nation’s history. They will, post-Booker, continue to be the rule where the sentence is within statutory limits. We have already decided that Apprendi, 530 U.S. at 490, 120 S.Ct. 2348, which provides jury trials for increasing statutory máximums, would not apply retroactively. See Sepulveda, 330 F.3d at 61-63. This resolves any comparable Blakely-Vke claim in this circuit.
As for the application of mandatory rather than advisory guidelines, it is unclear that advisory guidelines will alter a great number of sentences; mandatory mínimums imposed by statute are another question altogether. The guidelines remain a central consideration in sentencing; and sentencing courts must still consider the same statutory factors that the Sentencing Commission was required to use in promulgating the guidelines. See 18 U.S.C. § 3553(a) (2000); 28 U.S.C. § 994(m) (2000). To describe the use of mandatory guidelines as generating serious inaccuracy or fundamental unfairness would not be easy.
Realistically, it is unlikely that the Supreme Court will adopt a retroactivity analysis that opens up to required reexamination practically all of the federal sentences imposed since the guidelines went into effect in 1987. This would comprise tens of thousands of sentences imposed under a regime whose lawfulness was assumed during most of this period. If such a vast reopening of final judgments is required, it must await a decision of the Supreme Court. Certainly Booker itself does not give any clear hint that retroactive effect is intended.
Every other circuit that has considered this issue has agreed that Booker does not apply retroactively. See Varela v. United States, 400 F.3d 864, 866-68 (11th Cir.2005); Humphress v. United States, 398 F.3d 855, 860-63 (6th Cir.2005); McReynolds v. United States, 397 F.3d 479, 480-81 (7th Cir.2005); United States v. Mitchell, 122 Fed.Appx. 539, 540 (2d Cir.2005) (unpublished); United States v. Leonard, 120 Fed.Appx. 759, 761 (10th Cir.2005) (unpublished).
Cirilo’s sentence is vacated and the matter remanded to Judge Laffitte for resen-tencing. We leave it to the parties and to the district court to resolve in the first instance whether this new sentencing, which will occur post-Booker, should be governed by the advisory guideline regime. Although failure to use advisory guidelines is not the basis for the remand, the issue of their use once the remand is ordered on other grounds remains open for resolution.[7]

It is so ordered.

. Quotes such as these throughout this decision are taken from the trial transcript.

. It should be noted that Lugo had also told two different and later-recanted versions of events to the FBI before trial, at least one of which incriminated Cirilo. Given Cirilo's conviction, it is uncertain whether the jury credited Lugo's exculpatory statement at trial.

. Under section 2255, a federal court that imposed a sentence may vacate or correct it if "the sentence was imposed in violation of the Constitution or laws of the United States ... or ... the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack.”

. Whether 21 U.S.C. § 848(e)(1)(B) itself or its aiding-and-abetting variant require knowledge of the victim's status as a police officer is not clearly addressed by circuit case law, but the jury instructions in this case said that such knowledge was not necessarily required.

. The guideline, unlike the statute, explicitly requires that Cirilo's offense have been "motivated by" Mejias' status as an officer. U.S.S.G. § 3A1.2(a). This ordinarily would entail knowledge or belief that the victim is an officer, see, e.g., United States v. Garcia, 34 F.3d 6, 13 (1st Cir.1994) (knowledge of victim's status established motivation); United States v. Salim, 287 F.Supp.2d 250, 307-08 (S.D.N.Y.2003) (same), and at least one court has said that knowledge is necessary. United States v. Park, 988 F.2d 107, 110 (11th Cir.1993).

. Cirilo's conviction became final in 1998, when certiorari as to the direct appeal was denied. Cirilo-Muñoz v. United States, 525 U.S. 942, 119 S.Ct. 363, 142 L.Ed.2d 300 (1998). Because finality preceded even Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), Booker certainly announced a "new rule” to which the described retroactivity doctrine applies. See Beard v. Banks, - U.S.-, 124 S.Ct. 2504, 2511, 159 L.Ed.2d 494 (2004).

. We note that several courts of appeals have said that the advisory guidelines regime is to be used after Booker, even where remands for resentencing were not caused by a Boolcer error. See, e.g., United States v. Gutierrez-Ramirez, 405 F.3d 352, 359, 2005 WL 762664, at *6 (5th Cir. Apr. 5, 2005); United States v. Doe, 398 F.3d 1254, 1261 n. 9 (10th Cir.2005); United States v. Gleich, 397 F.3d 608, 615 (8th Cir.2005).