# United States Court of Appeals
## For the First Circuit

No. 05-2469

UNITED STATES,

Appellee,

v.

ERNESTO CIRILO-MUÑOZ, a/k/a Nesty,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Héctor M. Laffitte, Senior U.S. District Judge]

Before

Torruella, Lynch, and Lipez,
Circuit Judges.

Mark Diamond for appellant.
Germán A. Rieckehoff, Assistant United States Attorney, with
whom H.S. Garcia, United States Attorney, and Nelson Pérez-Sosa,
Assistant United States Attorney, were on brief, for appellee.

October 2, 2007

**Per Curiam**.  It is the decision of the court, by vote of the majority, that Ernesto Cirilo-Muñoz's sentence is vacated and remanded.  One judge votes for that remand because of his view that the sentence imposed is unreasonable and that the explanation for it is inadequate.  The other judge votes for remand because of the inadequacy of the sentencing explanation.  One judge dissents from this remand decision.

The majority of the court has rejected defendant's sentencing arguments that the sentence was unreasonable because there was insufficient evidence to convict him and, separately, that the fact of the sentence disparity between defendant and Lugo itself establishes that the sentence is unreasonable.  Two judges of the court disagree as to whether there was a Guidelines error as to the minimal participant issue; the third judge finds it unnecessary to address the issue on appeal in light of the remand for resentencing.

This result is explained by the three attached opinions.

**TORRUELLA**, **Circuit Judge**.  In varied forms and postures, this is the third instance in which we are called upon to pass on the fate of Ernesto Cirilo-Muñoz, also known as "Nesty."  See United States v. Manqual-Corchado, 139 F.3d 34 (1st Cir. 1998) (direct appeal); Cirilo-Muñoz v. United States, 404 F.3d 527 (1st Cir. 2005) (petition for review under 28 U.S.C. § 2255 for ineffective assistance of counsel).  I suggest that had Cirilo-Muñoz been more discerning as to the company that he kept, or put otherwise, had he not been in the wrong place at the wrong time, Manqual-Corchado, 139 F.3d at 54-55 (McAuliffe, J., dissenting), he would in all likelihood have passed through his otherwise unremarkable life without his existence ever receiving official notice.  But as these several appeals attest, such was not to be. Thus, Cirilo-Muñoz appears before us once more seeking justice, this time appealing from the twenty-seven year sentence imposed by the district court after its original draconian judgment of life imprisonment was vacated by us.  Cirilo-Muñoz, 404 F.3d at 533. Unfortunately, as I predicted, id. at 535-37 (Torruella, J., concurring), not much was gained by sending the case back to the same district judge.

In what is by now the most notorious central fact of this case, the district judge had sentenced the actual assassin of the victim, who was a Puerto Rico state policeman acting in an

-3-

undercover capacity, to seventeen[1] years imprisonment for the officer's murder, justifying this lopsided action on the fact that the murderer had turned state's evidence and "cooperated" with the Government. In contrast, in re-sentencing Cirilo-Muñoz, to whom the district judge was able to attribute no higher appellation than that of a "minor" participant in the perpetration of the crime for which he was convicted, see U.S.S.G. § 3B1.2(b),[2] the district

---

[1]Through these appeals we have been assuming that the murderer was sentenced to twenty-two years imprisonment, and it is technically correct that he was sentenced to a "total of 22 years." In fact, however, the Government had recommended a sentence of only fifteen years for Counts 1, 2, and 4 (with a mandatory sentence of five years for count 3). See United States of America, Motion Pursuant to Section 5K1.1 of the United States Sentencing Commission Guidelines Manual and Title 18 of U.S.C. Section 3553(e), United States v. Lugo-Sánchez, CR-94-363, at 5, ¶ 3j (Mar. 5, 1996). Ultimately, Lugo was sentenced to only seventeen years for Count 1 (aiding and abetting in the murder of the officer while trying to avoid prosecution for drug offenses), Count 2 (aiding and abetting in carjacking the officer's car in the process of which he was murdered), and Count 4 (aiding and abetting in the possession with the intent to distribute more than 500 grams of cocaine). See Transcript, Sentencing of José Lugo-Sánchez, United States v. Lugo-Sánchez, CR-94-363 ("Lugo Sentencing Tr.") at 27 (D.P.R. March 5, 1996). Thereafter, the district judge imposed an additional mandatory consecutive sentence of five years under Count 3 (aiding and abetting in the use of a firearm while committing a crime of violence). Id. The only count for which Cirilo-Muñoz was found guilty by the jury, and thus the only one appropriate for a consideration of his allegations as to disparity in sentencing, was Count 1, for which he was first sentenced to life imprisonment, and on remand, to twenty-seven years imprisonment.

[2]"Based on the defendant's role in the offense, decrease the offense level as follows: . . . (b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels." U.S.S.G. § 3B1.2(b). The Sentencing Guidelines define a minor participant as a defendant "who is less culpable than other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2 app. note 5.

-4-

judge "reduced" Cirilo-Muñoz's life sentence to "only" twenty-seven years of incarceration.[3] This results in a sentence imposed on the "minor" aider and abettor that is <u>59% higher</u> than that of the actual killer. Leaving aside the fact that the imposition of a sentence of twenty-seven years imprisonment on a minor participant in this case is grossly unreasonable, the absurdity of this unjustified disparity is further highlighted by the events surrounding this grisly murder, including the assassin's actions in that respect, and Cirilo-Muñoz's <u>minimal</u> involvement in this unfortunate event. This is strikingly evident if one considers that Cirilo-Muñoz was found guilty of only the aiding and abetting charge with regard to Count 1, having been absolved by the jury of both the carjacking and weapons offenses. Moreover, there was a dearth of evidence to sustain even the aiding and abetting charge because of Cirilo-Muñoz's lack of <u>prior</u> knowledge of the assassin's plans or intentions, or of his engaging in any deliberate action in aid or support of the same <u>before</u> the murder of the police agent by the actual killer.

Predictably, given the sentence imposed after remand, this appeal ensued in which Cirilo-Muñoz claims, in substance, that his sentence is unreasonable (1) because of the failure of the

---

[3]Cirilo-Muñoz was also sentenced to four years of supervised release, ordered to participate in a drug-testing program, and was assessed $50.00 in penalties. <u>See</u> Amended Judgment in a Criminal Case, <u>United States</u> v. <u>Cirilo-Muñoz</u>, CR-94-363 at 3-5 (D.P.R. Aug. 22, 2005).

district judge to grant him a further reduction in his sentence notwithstanding that the evidence showed him to be a "minimal" participant in the perpetration of the offense for which he was convicted, see U.S.S.G. § 3B1.2(a),[4] (2) because of the failure of the district judge to adequately consider and apply the factors established in 18 U.S.C. § 3553(a)[5] when determining his re-

---

[4]"Based on the defendant's role in the offense, decrease the offense level as follows: . . . (a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels." U.S.S.G. § 3B1.2(a). The Sentencing Guidelines define minimal participants as "defendants who are plainly among the least culpable of those involved in the conduct of a group." U.S.S.G. § 3B1.2 app. note 4.

[5]"The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--
    (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
    (2) the need for the sentence imposed--
        (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
        (B) to afford adequate deterrence to criminal conduct;
        (C) to protect the public from further crimes of the defendant; and
        (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
    (3) the kinds of sentences available;
    (4) the kinds of sentence and the sentencing range established for--
        (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--
            (i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

sentence, (3) by reason of the disparity in the sentence imposed after remand when it is compared to that received by the "key culprit" to the murder, and lastly, (4) because his constitutional right against excessive punishment is violated by his being sentenced for a crime for which he is innocent as a matter of law.

## I. **The Facts**

I am compelled to return to where I left off in my last intervention in this matter.  Cirilo-Muñoz, 407 F.3d at 538 (Torruella, J., concurring).  I then made reference to a quote from Gothe to the effect that, "[n]othing is more damaging to a new

---

(ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or
    (B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);
    (5) any pertinent policy statement--
    (A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and
    (B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.
    (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
    (7) the need to provide restitution to any victims of the offense."

truth than an old error,"[6] for if anything is consistently obvious throughout the tortuous path of this case it is how the previous errors committed by the controlling participants have haunted it, and have unjustly stacked the deck against Cirilo-Muñoz and obstructed the search for the truth.

The record is crystal clear that the Government commenced this case focusing on Cirilo-Muñoz as the prime suspect of the murder of the undercover police agent, Iván Mejías-Hernández (Mejías). This occurred because the actual perpetrator of the murder, José Lugo-Sánchez (Lugo), fingered Cirilo-Muñoz as the person who killed Mejías in an attempt to divert attention away from himself. This started on November 9, 1994, during the course of an interview with F.B.I. Special Agents René F. Medina (Medina) and Manuel Pérez, Jr. (Pérez), in which Lugo told the agents that on November 1, 1994, Cirilo-Muñoz and Saúl Mangual-Corchado (Saúl) accosted Mejías, whom Lugo said Cirilo-Muñoz suspected of being a police informant.[7] Lugo falsely claimed that Cirilo-Muñoz held a gun to Mejías and forced Mejías into his own car, a white Suzuki, and thereafter left the area with him and Saúl in the Suzuki, followed by a black Oldsmobile. Lugo told the F.B.I. agents that the following day he heard of Mejías's murder on television.

---

[6]Gothe, Spruche in Prosa.

[7]The agents' Report (also known as a "302 Report") is part of the record in this case.

Later that same day, Lugo gave a second false version of the murder of agent Mejías to the F.B.I.  This time, although admitting to some participation in the events surrounding Mejías's murder, Lugo continued to implicate Cirilo-Muñoz, whom he depicted as the proponent and leader of the group, claiming that Cirilo-Muñoz had told him that he was going to take Mejías and kill him, and needed to have Lugo and Luis Antonio Ramírez-Ynoa (Tony) follow in the black Oldsmobile to pick them up afterwards.

Based on the information provided by Lugo to the F.B.I. in these two interviews, on November 23, 1994, Agent Medina appeared before a grand jury and gave testimony which substantially tracked the information given to him and Pérez by Lugo, implicating Cirilo-Muñoz as the perpetrator of Mejías's murder and the carjacking of his automobile.[8]  At the time of his appearance before the grand jury, as will be presently discussed, it is not clear whether Agent Medina was totally unaware that the information given to him by Lugo on November 9 regarding Cirilo-Muñoz's actions and his alleged complicity in the murder of Mejías and the carjacking of Mejías's car, were almost completely false.[9]  In any

_____

[8]See Transcript of "Testimony of René F. Medina, Grand Jury Investigation, Before the Grand Jury, Federal Building, Hato Rey, Puerto Rico" (D.P.R. November 23, 1994).  This transcript is also in the record of the case.

[9]See Trial Transcript, United States v. Cirilo-Muñoz, CR-94-363 ("Trial Tr.") at vol. VI, pp. 654-61, 664-69, 674-75 (D.P.R. 1995).

event, based on Agent Medina's testimony, the grand jury issued an indictment on November 23, 1994.

The indictment that issued was never superseded, and thus this indictment (based on Lugo's fabrications) is the accusation on which the case against Cirilo-Muñoz was tried. Furthermore, Lugo's original story continued to dictate the Government's actions and its posture before the district court, a situation which in turn has greatly influenced the district court's actions.

The indictment charged in Count 1 that on November 1, 1994, Lugo, Cirilo-Muñoz, Saúl, and Ramírez-Ynoa aided and abetted each other "during the commission of, and while attempting to avoid apprehension . . . for a felony drug violation, to wit: possession with intent to distribute cocaine," by killing and/or counseling the intentional killing of Mejías-Hernández, a local law enforcement officer engaged in the performance of his official duties, in violation of 21 U.S.C. § 848(e)(1)(B) and 18 U.S.C. § 2. In Count 2, the same persons were charged with aiding and abetting each other in taking Mejías's motor vehicle by force, to wit, forcing Mejías into the car at gunpoint and causing his death, all in violation of 18 U.S.C. § 924(c)(1) and 18 U.S.C. § 2. Count 3 charges them with aiding and abetting each other in the use of a firearm while committing a crime of violence, to wit, the carjacking, in violation of 21 U.S.C. § 848(e)(1)(B) and 18 U.S.C. § 2. Count 4 charged only Lugo and Saúl with aiding and abetting

-10-

each other in possessing with the intent to distribute 500 grams or more of cocaine, a violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

As previously stated, it is not clear whether the Government knew that Lugo's story was fabricated before the indictment against Cirilo-Muñoz was sought. According to a 302 report dictated by Agent Medina the day before he testified before the grand jury,[10] he again met with Lugo on November 22 in the Guaynabo Metropolitan Detention Center, a federal facility, in the presence of Lugo's attorney and the Assistant U.S. Attorney working on the case. At that time, Lugo stated that his earlier statements "on November 9, 1994 were accurate as to his involvement with Ernesto Cirilo-Muñoz . . . . [I]n the murder of Officer Mejías . . . however Lugo . . . indicated that he had withheld information on other subjects that own and operate the drug point." The report further indicates that Lugo said that his previous statements to the F.B.I. about what Cirilo-Muñoz had told him on November 1 regarding Mejías, "had not been accurate." Lugo stated that what Cirilo-Muñoz had actually said was, "[F]ollow us so we can take this man down." Lugo stated that he had been traveling with "Tony" in a black Oldsmobile following Cirilo-Muñoz, Saúl, and Mejías, when Lugo asked Tony why Cirilo-Muñoz and Saúl were taking Mejías, and Tony responded, "[T]o take him down." Lugo said that after

---

[10]This report is also in the record of the case.

-11-

Cirilo-Muñoz and Saúl pushed the Suzuki off the road and boarded the Oldsmobile, Cirilo-Muñoz stated, "Boy, I gave him one in the stomach and three on the head." Lugo stated that Cirilo-Muñoz then said, "All of you know how this is, whoever talks or snitches, knows what will be coming." Lugo also told Agent Medina that he was surprised to see Cirilo-Muñoz at the drug point because approximately four months earlier, Cirilo-Muñoz left the area because he failed to pay for an undisclosed amount of drugs that he consumed, and ever since, had not been at the drug point. Lugo stated that it was common knowledge that specific instructions had been given that Cirilo-Muñoz was to be beaten up if he showed up, and thus Lugo was of the opinion that Cirilo-Muñoz should pay off his drug debt by killing Mejías.

At a minimum, by the time the Government sought its indictment against Cirilo-Muñoz, and Agent Medina appeared before the grand jury to repeat what Lugo had told him in the course of three interviews, it should have been apparent that Lugo was unreliable and less than truthful. It is obvious that the Government was uneasy with the information provided by Lugo up to then, for even though the investigation, which had been conducted by agents with considerable experience,[11] resulted in an indictment, the investigation continued even after the indictment was issued.

---

[11]For example, Agent Pérez had seven years experience with the F.B.I. Trial Tr. at vol. VII, p. 1062, l. 6.

Thus, on December 19 to 20, 1994, Agents Medina and Orlando Pages[12] again met with Lugo at the federal detention center,[13] during portions of which Lugo's defense lawyer and the Assistant U.S. Attorney were also present. During this interview, Lugo gave a third version of what transpired on November 1, 1994 regarding the murder of Police Officer Mejías and of Cirilo-Muñoz's involvement, or more accurately, his lack of involvement.

Lugo started by explaining that he had become indebted to "Chispo," a childhood friend. Chispo supplied the drugs that Lugo sold at the drug "punto"[14] in front of a small store known as "El Cafetín Ideal." Lugo had become indebted because in addition to selling drugs, he was using drugs and not paying for them. Lugo said that Chispo became upset with him, and Lugo's father had to bail him out by paying the money he owed. Thus, Lugo did not work the "punto" for about three weeks, after which he convinced Chispo to give him back his job and was assigned the 9:00 a.m. to 6:00 p.m. shift, Mondays through Wednesdays. Thereafter, he continued

---

[12]Agent Pages had nine years extensive experience with the F.B.I. Trial Tr. at vol. VII, pp. 880-81.

[13]The interview is memorialized in a nine-page 302 report dated December 20, 1994, subscribed to by both agents. The following discussion is based entirely on that report.

[14]Literally "point", which in drug parlance means "a place or locale where drugs are sold," usually outdoors on a street corner or the like.

selling drugs, "[u]ntil he killed Ivan Mejías Hernández on November 1, 1994."[15]

Lugo said that he first saw Mejías in October in front of Cafetín El Ideal. Thereafter, another drug dealer advised Lugo that Mejías had tried to purchase a "package" of cocaine[16] from him, but he did not sell it to him because he saw a revolver in Mejías's vehicle, a white Suzuki. Lugo stated that he saw Mejías again at El Ideal during the second week in October and sold him five small plastic bags of cocaine for fifty dollars. On Friday of the second week in October, Lugo saw Mejías for the third time at El Ideal. Mejías was looking for a person named Luis Navarro and left when he did not find him. By this time, Lugo stated, he and the other dealers running the drug point at Cafetín El Ideal had become suspicious of Mejías because he had purchased large amounts of drugs immediately after he met a dealer there. Because of this, Lugo and these dealers were of the opinion that Mejías was a snitch or undercover policeman. During the last week in October, Chispo told Lugo that if Mejías came back to Cafetín El Ideal and stayed after dark, "to take him and kill him." On Halloween night, which was the day before Mejías's murder, Chispo advised Lugo for the

---

[15]Agents Medina & Pages, 302 Report, December 20, 1994, at 1.

[16]A "package" in the illegal drug trade contains ten small plastic bags filled with cocaine.

-14-

second time that if Mejías came to the drug point at Cafetín El Ideal to make sure to take him and kill him.

Lugo explained that on November 1, 1994, he started selling drugs in front of Cafetín El Ideal at about 9:00 a.m. Between 9:00 a.m. and 2:00 p.m., others arrived at Cafetín El Ideal, including Saúl, Cirilo-Muñoz, and Tony. Sometime between 2:15 and 2:30 p.m., Mejías arrived in his Suzuki. He went into the Cafetín and purchased a bottle of rum. Mejías then called a person named "Navarro" on the telephone, whom he claimed owed him money. When Navarro showed up, he and Mejías had a heated argument and Navarro left on foot. Mejías then went to his vehicle where he retrieved a revolver and then put it back in his car, before following Navarro on foot. Lugo and some of the dealers ran after him to see what would happen, but only saw Mejías and Navarro talking to each other.

According to Lugo, Mejías returned to El Ideal, and at this time, Lugo decided to kill him as instructed by Chispo. Lugo walked to a small schoolhouse located next to El Ideal where Tony, Mejías, and a person named "David" were standing. Lugo asked them to accompany him to the back of a residence located in front of El Ideal owned by a person named "Juan." Once there, an argument ensued between Mejías and Lugo, Mejías claiming that he read Lugo's lips earlier that day when he saw Lugo tell David to accept Mejías's invitation to go shopping with him at the Plaza Carolina

-15-

Mall in order to learn more about him.  Lugo then accused Mejías of being a snitch, to which Mejías did not react, whereupon Lugo asked Tony for his car keys.  Lugo said he then went to Tony's car, a black Oldsmobile, where he retrieved a Colt .38 caliber revolver from the trunk.  Lugo returned to El Ideal, where he advised Saúl that he was going to take Mejías from the area in order to kill him.  Saúl advised Lugo that he should approach Mejías with the gun, and that he would go around the house and set upon Mejías from the other side to take his car keys.  They would then search Mejías's car for the revolver Lugo had seen.

Lugo and Saúl walked to the back of Juan's house and carried out their plan.  Lugo approached Mejías with the revolver and asked him for his car keys, which Saúl took.  Cirilo-Muñoz, Elio, and Saúl went to the car and searched it while Mejías sat on the back steps of the residence, watched by Lugo.  After Mejías's car was searched and his gun retrieved, Lugo escorted Mejías to the Suzuki and told him to leave the area and that he never wanted to see him again.  Mejías got into his car and started the engine, but did not drive away.  A person named "Yito" walked over to Lugo and said to him, "No, you've got to take him."  Lugo apologized to Mejías, and made him sit in the back seat behind the driver, while Saúl sat in the driver's seat and Lugo sat in the back with Mejías.  Tony walked over to Lugo and said he and Cirilo-Muñoz would follow in Tony's car so they could pick them up after they killed Mejías.

-16-

Lugo, Saúl, and Mejías drove away in Mejías's car. Cirilo-Muñoz and Tony followed with Cirilo-Muñoz driving. As the Suzuki drove away, Mejías turned toward Lugo and pled with him not to kill him, since he had a six-month old baby boy, to which Lugo responded, "I have to do it," firing once into Mejías's stomach. On impact, Mejías grabbed his stomach and opened his mouth, while gasping for breath, whereupon Lugo fired a second shot into the right side of Mejías's head. Saúl, who was driving the car, turned to complain about the noise and lost control of the car in a curve, ending up in front of someone's driveway. In the process Mejías's body fell toward Lugo, who moved, letting the cadaver fall lengthwise on the seat. Thereafter, Lugo sat on top of Mejías's corpse until the car had stopped. Upon noticing he was covered with Mejías's blood, Lugo moved to the front seat of the Suzuki.

Shortly afterwards, the Suzuki stopped on the road past a country store. Yito drove up on a motorcycle and asked what had happened to Mejías. Lugo told him he had killed him, to which Yito nodded his head in approval. Yito drove away and Lugo noticed Cirilo-Muñoz and Tony driving towards them in Tony's black Oldsmobile. Saúl and Lugo drove off, followed by the Oldsmobile with Tony and Cirilo-Muñoz. They all continued until reaching a deserted area where Cirilo-Muñoz and Tony pulled in front of Saúl and Lugo's car and stopped.

Tony got out and walked towards Lugo.  Lugo handed him the gun he used to shoot Mejías.  Tony asked Lugo if he made sure Mejías was dead; Lugo answered that had shot Mejías twice.  Tony then went into the Suzuki and shot Mejías twice in the back of the head.  Lugo got into the black Oldsmobile with Cirilo-Muñoz, Tony got into the Suzuki with Saúl, and both cars left with the Suzuki leading the way.

At that point Cirilo-Muñoz asked Lugo how he killed Mejías, but Lugo, who was under the influence of cocaine, would not answer.  Cirilo-Muñoz told Lugo that, earlier, Tony had stated that if Lugo did not make sure that Mejías was dead, Tony would personally make sure he was.  They eventually found the quarry that Lugo was looking for and Saúl and Tony pushed the Suzuki over the side of the hill with Mejías's body inside.  Saúl and Tony ran and got into the Oldsmobile with Cirilo-Muñoz and Lugo.  Again, while they were driving away from this scene, Cirilo-Muñoz, who was driving the car, asked Saúl, Lugo, and Tony how they killed Mejías, but no one would answer him.  Instead Lugo counted the money he took from Mejías's body, which totaled two hundred and forty dollars, and divided it equally among the occupants of the car.

Cirilo-Muñoz drove Lugo to his home, and they separated. Lugo stated that he burnt this bloody clothes, putting the buttons and zipper in the trash as they would not burn.

Lugo then told Agent Medina that he had switched roles with Cirilo-Muñoz during his original account of the events because he feared Cirilo-Muñoz least of those involved. Lugo also thought Cirilo-Muñoz would be supported least by the drug dealers involved.

I have taken the trouble of detailing these incidents because they are important in several ways. First of all, this last version of events is substantially different than the prior statements given by Lugo. More importantly, it is different in ways that significantly bolster Cirilo-Muñoz's present contention as to his minimal participation in the crime for which he was found guilty. Secondly, I wish to point to the fact that the Government never resubmitted this new evidence to the grand jury notwithstanding that it was this new version of events that the Government later relied on in its case against Cirilo-Muñoz. It would seem that had the Government's prime concern been seeing that justice was done, upon acquiring this new knowledge of Lugo's murder of Mejías and Cirilo-Muñoz's attenuated role therein, its duty was to reconvene the grand jury to seek a superseding indictment charging Cirilo-Muñoz with being an accessory after the fact, 18 U.S.C. § 3, the crime which the evidence showed he actually committed, rather than as an aider and abettor of Mejías's murder. In fact, Lugo's testimony at trial substantially tracked his December 19-20 statement to the F.B.I., except that, as I will

presently detail, his actual testimony is even more favorable to Cirilo-Muñoz's contentions.[17]

Lugo, who was eligible to receive the death penalty for the murder of Mejías during the commission of the carjacking, 18 U.S.C. § 2119(3), and for his murder of a police officer, 21 U.S.C. § 848(e)(1)(B), pleaded guilty to the charges against him pursuant to an agreement entered with the Government whereby he agreed "to cooperate fully and truthfully with the United States" including "to testify as a witness before any Grand Jury . . . and at any hearing or trial, when called upon to do so by the United States".[18] The agreement is "conditioned only upon [Lugo] providing full, complete and truthful cooperation," and he is "only required to tell the complete truth."[19] If he failed "in any way to fulfill completely all obligations under this agreement," including "withholding evidence, or otherwise . . . not [being] completely truthful with the United States . . . or in testimony before a Grand Jury or at trial," then the Government would be released from

---

[17]See Trial Tr. at vol. V, p. 546 - vol. VII, p. 827.

[18]Plea and Cooperation Agreement, United States v. Lugo-Sánchez, CR-94-363 ("Plea and Cooperation Agreement") at 4, ¶ 7a (D.P.R. September 11, 1995). It is signed by Lugo, his attorney, and the Assistant U.S. Attorney. They also subscribe to an attached document entitled "Government's Version of the Facts" which appears to be a verbatim copy of Agents Medina and Page's 302 Report from December 19-20, 1994, the so-called third version of events which was never submitted to the grand jury.

[19]Plea and Cooperation Agreement at 5, ¶ 8.

its obligations under the agreement and Lugo could be fully charged with the crimes to which he confessed, as well as perjury.[20] Upon acceptance of this agreement by the court, the Government agreed that Lugo would not be charged with any other crimes committed by him about which he had informed the Government, "if he testifies truthfully at any grand jury, trial or other proceeding."[21] In exchange for Lugo's plea and agreement, the Government further "agreed to recommend to the Court, at the time of sentencing, that a downward departure is appropriate and [to] inform the Court of the extent of cooperation provided by defendant [Lugo]."[22]

Lugo thus became the star for the prosecution, testifying against his co-defendants, including Cirilo-Muñoz, commencing September 18, 1995, the fifth day of the trial.[23]  His testimony substantially consisted of a reiteration of the third version of the events surrounding his murder of Agent Mejías on November 1, 1994,[24] in which he basically retracted his implication of Cirilo-Muñoz as the murderer and principal, and admitted it was he who

---

[20]Id. at 5-6, ¶ 9.

[21]Id. at 8, ¶ 14.

[22]Id. at 8-9, ¶ 16.

[23]See Trial Tr. at vol. V., pp. 547 - vol. VII, p. 827.

[24]See id. at vol. V, p. 556, ll. 6-16; id. at vol. V, p. 558, ll. 14-19.

killed Mejías and led this criminal enterprise.[25]  I will thus not repeat what has been amply detailed.  However, Lugo's trial testimony further clarified several points which are important in absolving Cirilo-Muñoz from the shadow of wrongdoing cast on him by the chain of events I have described.  These clarifications are relevant to the issue of the reasonableness of the sentence imposed because they not only establish that Cirilo-Muñoz lacked prior knowledge that Mejías would be killed by Lugo, but that in any event, his participation in the events was minimal prior to Mejías's murder by Lugo.  Furthermore, it is important to emphasize that this is the uncontradicted evidence of the Government's own witness, a witness who has hanging over his head the threat of losing a benevolent sentencing arrangement if he does not testify truthfully.  Thus, rather strong proof that Lugo testified truthfully, and that the Government believes that he did, lies in the fact that the Government has not reneged on the plea agreement.  This makes the Government's actions regarding Cirilo-Muñoz's sentence even more egregious.

The testimony of Lugo at trial established that besides Lugo, only Tony knew about the existence of a gun, having been called on the telephone by Lugo, told of Lugo's intention to kill

---

[25]See id. at vol. V, p. 557, ll. 2-11.

Mejías,[26] and asked to bring the gun to El Ideal on November 1, shortly before the assassination.[27]

Lugo's testimony further established that after Lugo's confrontation with Mejías behind Juan's house, Lugo left with Tony and David, and proceeded alone towards El Ideal, where Cirilo-Muñoz was, as well as Yito and several young men.[28] Because Lugo was mad at Mejías as a result of the incident with him behind Juan's house, he invited Cirilo-Muñoz to hit Mejías.[29] This offer was rejected[30] and Lugo "started getting angrier, angrier and angrier," and went to Tony, who had remained behind Juan's house, got the keys to the Oldsmobile, and retrieved the gun from under the rear seat.[31] Lugo then returned the car keys to Tony and went back to El Ideal by himself,[32] where he encountered Cirilo-Muñoz, Yito, Saúl, and several others.[33] The gun was in Lugo's waist, with his shirt pulled out and covering the firearm.[34] Upon encountering Saúl at

---

[26]See id. at vol. V, p. 578, ll. 21-25.

[27]See id. at vol. V, p. 579, ll. 13-15.

[28]Id. at vol. V, p. 592, ll. 21-25.

[29]Id. at vol. V, p. 593, ll. 1-5

[30]If Cirilo-Muñoz refused to join in the beating up of Mejías, is it logical that he would shortly thereafter join in his murder?

[31]Id. at vol. V, p. 593, ll. 4-13.

[32]Id. at vol. V, p. 593, l.23 - p. 594, l.2.

[33]Id. at vol. V, p. 594, ll. 1-2.

[34]Id. at vol. V, p. 594, ll. 3-14.

Cafetín El Ideal, Lugo again tried to get them to beat up Mejías,[35] but again the record does not show any takers.  Saúl then suggested that he would go around Juan's house and come up behind Mejías while Lugo pointed the gun at him, and take Mejías' car keys away from him,[36] and "that's how it was."[37]  Then, everyone behind Juan's house (Saúl, Tony and David Silva) left.[38]  **While this was happening, Cirilo-Muñoz was "in the business"**, **i.e.**, **the Cafetín El Ideal.**[39]

Lugo testified that he proceeded **alone** to the Suzuki with Mejías in front of him, having warned him not to try anything, as

---

[35]Because of translation problems, a recurrent problem that is apparent throughout this record, it is not clear if Lugo is referring to all of those who were present, of just to Saúl. The transcript reads as follows:

> LUGO: There I encountered Saúl [Mangual-] Corchado and the ones I've mentioned, to fire them up.
>
> THE REPORTER: "To fire them up?"
> . . .
> LUGO: I again mentioned this to <u>him</u> to "prenderlo, prenderlo, so that we could all hit him."
>
> THE INTERPRETER: "Prenderlo, not fire <u>them</u> up."

<u>Id.</u> at vol. V, p. 594, ll. 16-22 (emphasis added).

[36]<u>Id.</u> at vol. V, p. 595, ll. 7-13.

[37]<u>Id.</u> at vol. V, p. 595, ll. 15-21.

[38]<u>Id.</u> at vol. V, p. 595, l. 23; p. 596, ll. 9-11.

[39]<u>Id.</u> at vol. V, p. 596, ll. 12-13.

-24-

he was armed.[40] Saúl, Tony, Junito, and David were at the Suzuki, searching the car for Mejías's weapon, and had found it,[41] whereupon Lugo waited for them to get away from the car.[42] Lugo then told Mejías to get in, and "not come around anymore ever."[43] Before Mejías could leave, someone told Lugo that he "had to take him [i.e., Mejías] away; that he could come back."[44] Lugo opened Mejías's door and told Mejías to get into the rear seat and signaled Saúl to get into the driver's seat.[45] Lugo went around, opened the door and got into the rear, and once inside the car, pulled out the gun he had been carrying in his waist.[46] Saúl started the car, and he and Lugo left with Mejías in the Suzuki,[47] and "six or ten seconds" later Lugo shot twice at Mejías, once into his stomach and once into his right temple.[48] Before Lugo fired the

---

[40]Id. at vol. V, p. 596, l. 21 - p. 597, l. 1.

[41]Id. at vol. V, p. 596, ll. 15-19.

[42]Id.

[43]Id. at vol. V, p. 597, ll. 3-5.

[44]Id. at vol. V, p. 598, l. 12 - p. 599, l. 1.

[45]Id. at vol. V, p. 599, ll. 3-7.

[46]Id. at vol. V, p. 599, ll. 9-19.

[47]Id. at vol. V, p. 599, ll. 21-23.

[48]Id. at vol. V, p. 600, l. 17 - p. 601, l. 19.

shots, Mejías asked him "not to kill him, that he had a six-month baby girl," but he "didn't pay attention to him."[49]

From the above testimony of the Government's star witness -- the only testimony presented by the Government regarding Cirilo-Muñoz's state of mind -- there is simply no evidence that Cirilo-Muñoz knew what was going to happen or was happening. And there is certainly not a scintilla of proof that he intentionally aided in these events; the fact that he was absolved of the carjacking and weapons charges merely confirms this asseveration. Although Lugo testified that he had seen Cirilo-Muñoz before, "real close to the [Suzuki]" when Tony, Saúl, Junito and David were searching it for Mejías's weapon, he stated that Cirilo-Muñoz was "not searching inside the car" -- he was just "looking."[50] Lugo further stated, however, that when he and Saúl left in the Suzuki with Mejías, Cirilo-Muñoz and Tony "were at the El Ideal Cafetín -- or Cafetín El Ideal."[51] Lugo later testified that after he had killed Mejías, farther down the road, Saúl came to a stop near a business called "El Cano's," and when he "looked toward the front, Cirilo[-Muñoz] and Tony Ynoa were in the -- were in the Oldsmobile."[52] Thereafter, "[t]hey followed behind [the Suzuki]. [Lugo] really [doesn't] know

---

[49]Id. at vol. V, p. 600, ll. 23-25.

[50]Id. at vol. V, p. 597, ll. 16-19 (emphasis added).

[51]Id. at vol. V, p. 600, ll. 10-15 (emphasis added).

[52]Id. at vol. V, p. 602, ll. 8-24.

-26-

whether they had agreed -- they agreed to follow because [Lugo] did not hear anything."[53]  I will not discuss the events that transpired thereafter, as they are irrelevant to the central issue of aiding and abetting in the murder of Mejías, which require proof of what transpired <u>before</u> the murder took place. Suffice it to say that the evidence in this record does not have the requisite <u>prior</u> knowledge by Cirilo-Muñoz.

## II. <u>The Standard: What is the function of a court of appeals in determining the validity of a criminal sentence</u>?

As recently restated by the Supreme Court, "[t]he federal courts of appeals review federal sentences and set aside those they find 'unreasonable.'"  <u>Rita</u> v. <u>United States</u>, 127 S. Ct. 2456, 2459 (2007); <u>cf.</u> <u>United States</u> v. <u>Booker</u>, 543 U.S. 220, 261-263 (2005). The Court further affirmed the obvious: "[D]istrict judges . . . [a]t times impose sentences that are unreasonable [and] [c]ircuit courts exist to correct such mistakes when they occur." <u>Rita</u>, 127 S. Ct. at 2466.  As is already clearly apparent, the present case is undoubtedly one in which the sentence imposed is patently unreasonable.  It is thus the duty of this Court to carry out its designated function by vacating the sentence, and remanding the case again for a second resentencing.

Clearly, whether a sentence is "reasonable" is a mixed question of law and fact.  <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Willams</u>, 475

---

[53]<u>Id.</u> at vol. V, p. 603, ll. 4-6.  <u>See also</u> <u>id.</u> at vol. VI, p. 697, l. 8 - p. 698, l. 11.

F.3d 468, 474 (2d Cir. 2007). As such a sentence is subject to review under an abuse of discretion standard which is guided by what has been established by Congress as the prevalent sentencing legal philosophy of the United States. Rita, 127 S. Ct. at 2470-71 (Stevens, J., concurring) ("Simply stated, Booker replaced the de novo standard of review required by 18 U.S.C. § 3742(e) with an abuse-of-discretion standard that we called 'reasonableness' review." (quoting United States v. Booker, 543 U.S. 220, 262 (2005))). In Rita, the Court emphasized Congress's mandate to sentencing judges established in the basic sentencing objectives set forth in 18 U.S.C. § 3553(a), as well as in its directive to sentencing judges that they "impose ... sentence[s] [that are] sufficient, but not greater than necessary, to comply with" these basic aims. Id. at 2463; see also 18 U.S.C. § 3553(a). The Court additionally underscored the "Statutory Mission" and "Basic Approach" given by Congress when it enacted this legislation: "'uniformity in sentencing by narrowing the wide disparity in sentences imposed by different federal courts for similar conduct,'" as well as "'proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of different severity.'" Id. at 2464 (quoting U.S.S.G. § 1A.1, intro to comment, pt. A, ¶ 2) (emphasis in the original).

Thus, I see our role in determining the validity of a sentence whose reasonableness is questioned as one requiring

analysis of the sentence and the reasons given by the sentencing court in reaching its conclusions, tested against the record of the case to determine whether the reasoning is supported by the record, and ultimately, whether the sentence is reasonable. Of course, in analyzing a sentence, we look to the basic sentencing objectives of 18 U.S.C. § 3553(a), and ultimately, whether the sentence is "sufficient but not greater than necessary" to comply with the basic aims listed in § 3553(a)(2):

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

It is probable that it may not be possible to establish beforehand an all-encompassing definition of what is a "reasonable sentence" -- a definition that covers all circumstances and extremes. But all is not lost, and this is not an unheard-of situation in the law. See, e.g., Booker, 543 U.S. at 262 ("'Reasonableness' standards are not foreign to sentencing law."); Williams v. Taylor, 529 U.S. 362, 387 n.4 (2000) (noting that the term "unreasonable" was difficult to define in the context of the Anti Terrorism and Effective Death Penalty Act). It is possible to establish the middle ground, and leave the establishment of the

fringes to the development of jurisprudence. That is, after all, the tried and true process of our common-law system. Perhaps a valid starting point is the dictionary. There, we come upon the definition of "reasonable" as "amenable . . . agreeable to reason, just, rational, not immoderate, not excessive, not unjust, tolerable, moderate, sensible . . . ." <u>Webster's New Unabridged Oxbridge Dictionary</u> 1502 (1972).

The sentence appealed from by Cirilo-Muñoz does not withstand the scrutiny imposed by these standards. As I will demonstrate: (1) the scant reasoning provided by the sentencing judge is faulty and is not supported by the record; (2) the sentence fails to meet the objectives of § 3553(a) because it is substantially greater than necessary to comply with those basic aims; (3) the sentence fails to promote uniformity in sentencing when compared to similar sentences imposed in the federal system; and (4) the sentence is grossly disproportionate when the severity of the defendant's actions is considered. Cirilo-Muñoz's sentence also fails the <u>Webster's</u> test: it is unjust, immoderate, and intolerable. In short, the sentence imposed upon Cirilo-Muñoz after remand is unreasonable.

### III. <u>Is the Sentence Supported by the Judge's Reasoning</u>?

Although we are concerned with the sentence imposed on Cirilo-Muñoz after we remanded the case, given that the second sentence was nearly equally as draconian as the first, the

circumstances of the first sentence serve as background to the present appeal and shed some light on the district judge's actions and reasoning in the matter presently before us.

In the first sentencing proceeding, although there was a dearth of evidence to the effect that Cirilo-Muñoz knew that Mejías was a police officer and that Lugo planned to kill him -- a point emphasized by counsel for the defense to the district judge -- the judge flatly rejected this contention and instead concluded that there was evidence to infer that "this defendant knew that the victim was a police officer and he was being killed because he was a police officer."[54] The judge then proceeded to analyze a version of the evidence that is not supported by the record, which commences with Cirilo-Muñoz's arrival at El Ideal ten to fifteen minutes after Tony, which the judge deemed "important because that place[d] Cirilo-Muñoz in that area which is a very small area close to the main events."[55] Thereafter, the judge continued discussing the events that followed, assuming and speculating, despite the lack of any support on the record, knowledge by Cirilo-Muñoz as to what was going on regarding Lugo's plans and actions,[56] even regarding crimes as to which Cirilo-Muñoz was acquitted by the

---

[54]See Transcript of Sentencing Hearing, United States v. Cirilo-Muñoz, CR-94-363 ("Sentencing Tr.") at p. 13, ll. 11-15 (D.P.R. January 16, 1996).

[55]Id. at p. 13, ll. 20-22.

[56]Id. at pp. 13-15.

jury.[57] In fact, it could be argued from statements at that hearing that the judge erroneously thought that mere presence at the scene by Cirilo-Muñoz was sufficient to imply knowledge and intent. <u>See</u> <u>United States</u> v. <u>Guerrero</u>, 114 F.3d 332, 342 (1st Cir. 1997). The judge's faulty reasoning is especially apparent in his surmising Cirilo-Muñoz's <u>prior</u> knowledge from the fact that the Suzuki went out of control because of the loudness of the shots fired by Lugo into Mejías.[58] Apart from the lack of logic of these events establishing the <u>prior</u> knowledge by Cirilo-Muñoz, there is absolutely no evidence to establish that the Oldsmobile in which Cirilo-Muñoz was driving was anywhere near the Suzuki when the fatal shots were fired. Yet the district judge had no qualms in concluding, "I'm certain a fired shot must have been heard by the drivers in the other car."[59] Based on this dubious evidence and total speculation, the judge went on to conclude that although Cirilo-Muñoz was a minor participant, he knew that Mejías was a police officer. Although he stated at first that he would not give him life imprisonment,[60] the judge nevertheless proceeded to impose

---

[57]"And then [Cirilo-Muñoz] got into the car with Ynoa -- to follow the victim who was kidnaped or abducted in the car. And he knew at that time that they were not going to go to a picnic. That was -- that was -- there's -- there's -- there was something going on there." <u>Id.</u> at p. 14, ll. 16-20.

[58]<u>Id.</u> at p. 14, l. 22 - p. 15, l. 8.

[59]<u>Id.</u> at p. 15, ll. 6-8.

[60]<u>Id.</u> at p. 6, l. 10.

life imprisonment.[61] Finding that the sentence lacked any support in the facts of the case, we vacated and remanded to the district court for resentencing.

With this background we thus come upon the resentencing hearing held on August 19, 2005, which is further illustrative of the district court's reasoning. As previously indicated, upon motion of Cirilo-Muñoz's counsel and in consonance with this Court's ruling, the presentence report was amended to strike its asseveration to the effect that Cirilo-Muñoz was involved in the distribution of drugs, there being no evidence in the record to said effect.[62]

Also upon motion of Cirilo-Muñoz's counsel, the presentence report was amended to reflect our decision to the effect that there was no evidence on the record to support the conclusion that Cirilo-Muñoz knew that Mejías was a police

---

[61]Id. at p. 27, ll. 20-21. The statements by the judge seem to confuse Lugo's actions when he murdered Mejías with Cirilo-Muñoz's, who was nowhere in the vicinity when Lugo killed Mejías. Thus, the district judge refers to the heart-rending incident in which Mejías begs for mercy, an event that took place while Lugo was with Mejías and Tony in the Suzuki, after they had left the El Ideal area, and before Cirilo-Muñoz and Tony arrived in the Oldsmobile down the road near the general store, El Cano's. Id. at p. 27, ll. 7-9. Cirilo-Muñoz was not a participant, not even a witness, to this cold-blooded act by Lugo, yet the district judge seems to hold it against him.

[62]Transcript of Resentencing Hearing, United States v. Cirilo-Muñoz ("Resentencing Tr.") at p. 3, l. 20 - p. 4, l. 24 (D.P.R. August, 19, 2005).

-33-

officer,[63] which as has been pointed out in discussing the first sentencing hearing, was a key finding of the district court on which it based its imposition of Cirilo-Muñoz's life sentence.[64]

Defense counsel then requested that there be a further amendment to reflect that "there's no evidence in the record to determine why Mr. Cirilo followed the car.  In other words, there is no evidence that anyone asked my client to follow him."[65]  This colloquy then took place:

> THE COURT: Then why did he follow him?
>
> COUNSEL FOR CIRILO-MUÑOZ: That's exactly what the Court of Appeals said. We don't know the answer to that. There's no evidence on the record as to that.
>
> THE COURT: Because the problem is that this individual, Mejías, was, I would say, sort of kidnapped into this vehicle, and then the other vehicle followed where this defendant was in that vehicle.  Wasn't he driving the vehicle, the defendant?
>
> COUNSEL: Was he driving the other vehicle?
>
> THE DEFENDANT: Yes.
>
> THE COURT: So how come you are going to follow another car that has already there unwillingly in custody? I mean -- and then that car was thrown over some quarry so that this car was needed to bring back the other fellows. I think that he knew that he was following that car.  He didn't know that he was a police

---

[63]Id. at p. 5, l. 16 - p. 6, l. 5.

[64]Supra note 54.

[65]Resentencing Tr. at p. 6, ll. 12-16.

officer, but that's another point.  This, I
will deny this.[66]

This interchange reveals several errors, including several inappropriate assumptions by the district judge.

First of all, it is apparent from the judge's comments that he assumed that Cirilo-Muñoz knew that Mejías was being kidnaped by Lugo, and somehow was an accomplice or an aider and abettor in that endeavor. In fact as the record clearly establishes, Cirilo-Muñoz was kept outside the inner circle of knowledge as to what was going on.  He was unaware that Lugo was armed, Lugo keeping the gun hidden under his belt[67] and not taking it out until he was in the Suzuki with Mejías and Saúl.[68]  There is simply no evidence that would allow the judge to conclude that Cirilo-Muñoz was aware that Mejías was "sort of kidnaped in his vehicle."  Furthermore, to the extent that this statement reflects that the judge somehow lumped Lugo's taking of Mejías with the carjacking of his vehicle, it seems to be an inappropriate confusion or merger of facts and charges, and the consideration by the judge of allegations as to which the jury clearly absolved Cirilo-Muñoz, i.e., Counts Two and Three of the indictment. Additionally, there is simply no evidence to support the judge's

---

[66]Id. at p. 6, l. 16 - p. 7, l. 19.

[67]Trial Tr. at vol. V, p. 594, ll. 3-14.

[68]Id. at vol. V, p. 599, ll. 9-19.

-35-

comments regarding the so-called follow-up car, as Lugo, the Government's star witness and the only one to testify in this regard, stated that he did not know why Cirilo-Muñoz had shown up in the Oldsmobile,[69] as he had never told Cirilo-Muñoz to follow him.[70] In fact, it was only Lugo who knew about the quarry, and it was he who led the way there.

The Government then presented its arguments. Although by now, having had the benefit of Lugo's third confession and testimony at trial, the prosecution should have known better, it continued its take-no-prisoners approach to Cirilo-Muñoz, adding its own fuel to the fire, and further leading the court to error:

> ASSISTANT U.S. ATTORNEY: He killed -- He was involved in killing of an individual that happened to be also a law enforcement. Part of the group that was involved in the killing knew that he was a law enforcement.
>
> Therefore, at least 99.9 of that group knew they kidnaped and they were to kill a law enforcement.
> . . .
> You cannot be an accessory after the fact when you follow the vehicle when the police officer was kidnaped and they were going to kill him.
>
> The murder happened after this defendant followed that vehicle, and he was the driver. Therefore, he was a participant prior to the killing. He was a participant while the police officer was being kidnaped.

---

[69]Id. at vol. V, p. 603, ll. 4-6.

[70]Id. at vol. VI, p. 698, ll. 2-21.

> THE COURT: When they pushed the car down the
> quarry with the victim inside the car, that
> cannot be done. That's why he was found guilty
> of aiding and abetting as to murder.
> . . .
> ASSISTANT U.S. ATTORNEY: A law enforcement
> officer died because this defendant, as well
> as others, were involved.[71]

Of course these interchanges reveal not only misstatements by the prosecution but also factual errors by the judge. The very remand took place because of lack of evidence that Cirilo-Muñoz was aware of Mejías's status as a police officer. Furthermore Cirilo-Muñoz was acquitted of any complicity in the kidnaping/carjacking of Mejías. Additionally, Mejías was murdered by Lugo within seconds of leaving the El Ideal area. At this point Cirilo-Muñoz was not only not following in the Oldsmobile, but according to the only evidence in the record -- Lugo's testimony at trial -- he and Tony were at El Ideal.[72] Lastly, although Cirilo-Muñoz was present when the Suzuki was pushed over the embankment,

---

[71]Resentencing Tr. at p. 20, l. 17 - p. 22, l. 6. This hostile and aggressive attack by the prosecution against Cirilo-Muñoz is in great contrast to the Government's friendly, almost paternalistic stance at Lugo's sentencing hearing. Although Mejías's murder and carjacking were admittedly "not the only assaults he had committed, [and] not the only violent crime he had ever engaged in [having previously been sentenced for robbery]", Lugo Sentencing Tr. at p. 10, ll. 6-7, and Lugo was thus considered a "potential enforcer" by his drug bosses, id. at p. 10, l. 15, the Government extolled his contributions as a witness, saying he cooperated from the beginning, and glossing over his initially false statements about Cirilo-Muñoz, which the Government did not even deign to mention. Id. at p. 17, l.6 - p. 18, l. 24.

[72]Tr. V, p. 600, ll. 8-24.

there is no evidence that he participated in this act, which in any event would have made him an accessory <u>after</u> the fact, not an aider and abettor in the murder, as Mejías was unfortunately already dead.

Not content with the situation, the district judge then proceeded to interrogate Cirilo-Muñoz directly:

> THE COURT: Let me ask you this question: Why did you follow the car where the victim here was being kidnaped?
>
> THE DEFENDANT: Well, when they thought they were going to give this person a beating, I never had any awareness of a death or anything, because otherwise, I wouldn't have done it, and in my very own ignorance, I wanted to see just to look, and when I came to learn about it, it was too late. I couldn't go back. And then my life was also at risk because I was in the midst of it all, without really having wanted to.
>
> THE COURT: You stopped the car near the other cars; right?
>
> THE DEFENDANT: Not so near.
>
> THE COURT: How far?
>
> THE DEFENDANT: One hundred meters.
>
> THE COURT: Did you observe when they pushed the car over the quarry?
>
> THE DEFENDANT: When I got there, that's what they were doing. I don't know what they were doing. I saw that, but like I said, it was already too late. I was already involved.
>
> THE COURT: And you knew that Mejías was inside the car when the car was being pushed down the quarry?

-38-

MR. GUZMAN: I think for the translation, I think he also said he was already dead. He also said that earlier.
. . .
THE DEFENDANT: By the time I got there, they were doing that. It was already done.

THE COURT: And you knew there was a person inside that car, the victim?

THE DEFENDANT: Well, not really. I never saw him.

THE COURT: Who brought the others, Lugo and Ramírez-Ynoa back?

THE DEFENDANT: I did.

THE COURT: Well, then you followed them to bring them back in another car; right.

THE DEFENDANT: Oh, I have never said -- no.

THE COURT: So didn't you wonder what happened to the person that was inside the car?

THE DEFENDANT: After the facts, yes. That's when I learned what had gone on.[73]

The district judge then proceeded to resentence Cirilo-Muñoz, explaining that he would not make any variance "[b]ecause I don't feel that the whole affair in this case requires that I vary the sentence downward . . . . I will sentence him under the advisory guidelines, and I'll give him a reasonable sentence" (emphasis added).[74]  The judge then proceeded to "explain" his reasoning by

---

[73]Resentencing Tr. at p. 23, l. 25 - p. 26, l. 9.

[74]Id. at p. 27, ll. 20-25.  To what "whole affair" was the judge referring?  Cirilo-Muñoz was found guilty only on Count 1, and was a minor participant at that, according to the judge.

-39-

simply reading the various sentencing factors in 18 U.S.C. § 3553(a), and stating how "Defendant Lugo Sánchez was the person who knocked at the door first," and cooperated with the Government, thus warranting the special treatment that he received.[75]

Getting to the specifics of the sentence, the district judge said that he had

> to pay obeisance to the Court of Appeals where the Court says that the evidence was thin. The Court of Appeals didn't say there was no evidence. Simply, it was thin, which means there was some evidence. . . . [I]t's going to be very difficult for a Court of Appeals or a higher court to reverse a judge when the judge sentences a defendant at the lower end of the advisory guideline. That's as reasonable as I can be. As a matter of fact this defendant is getting a 38-year reduction [from the prior life sentence]. If he lives to 65, he would get a 43-year reduction.[76]

The judge then proceeded to sentence Cirilo-Muñoz to 324 months of imprisonment, i.e., twenty-seven years.[77]

I cannot say that these statements by the district court, which consist mainly of a restatement of the law as well as a sarcastic statement regarding the "reduction," provide me with much insight into his reasoning. Reading between the lines, I get the distinct impression that it is merely a clumsy attempt to evade appellate review. I do not believe it is a successful one.

---

[75]Id. at p. 28, l. 17 - p. 29, l.17.

[76]Id. at p. 30, l. 21 - p. 31, l. 18.

[77]Id. at p. 32, l. 17.

-40-

**A. "The nature and circumstances of the offense" of which
Cirilo-Muñoz was convicted.**

I start with the first factor to be considered in imposing a sentence, "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1).  As should be crystal clear from the recitation of the facts, **there is no evidence in the trial record that Lugo told Cirilo-Muñoz,[78] or any one else in Cirilo-Muñoz's presence,[79] that he intended to kill Mejías or that Cirilo-Muñoz had this prior knowledge that he intended to kill Mejías,[80] and most importantly, that Cirilo-Muñoz did anything before Mejías was killed intending to aid in this nefarious endeavor**.  I recognize that this statement is contrary to the jury verdict, which has already been affirmed by this Court.  See Manqual-Corchado, 139 F.3d 34.  Although I strongly believe that the conviction should have been reversed, even accepting that there was minimally sufficient evidence for a

---

[78]See Trial Tr. at vol. V, p. 586, ll. 2-4.

[79]Cirilo-Muñoz was not present in the back of Juan's house, across the street from the Cafetín El Ideal, when Mejías had the argument with Lugo in the presence of Tony and David Silva.  There, Mejías confronted Lugo about the conversation between Lugo and David -- which Mejías had lip-read -- in which Lugo had asked David to go with Mejías to Plaza Carolina to check on the bona fides of Mejías, whom Lugo suspected of being a police informant.  See generally Trial Tr. at vol. V, pp. 586-92.

[80]See Trial Tr. at vol. VI, p. 696, l. 22 - p. 697, l. 1.

jury to find Cirilo-Muñoz guilty, that evidence shows that his link to this crime was so attenuated, so remote, that even the appellation "minimal participant" does not do it justice. I briefly explain.

First, given the testimony that nobody told Cirilo-Muñoz of the intended murder of Mejías before it happened, at best, Cirilo-Muñoz could not have had more than fleeting knowledge that a crime was going to occur. Moreover, there was no testimony that Cirilo-Muñoz had any desire to engage in any sort of violence against Mejías; if anything, he had turned down two of Lugo's invitations to injure Mejías. Furthermore, to the extent that Cirilo-Muñoz did provide some minimal support by driving a getaway car, it is hard to see how this sole action could be considered so worthy of our opprobrium that we would put Cirilo-Muñoz in jail for what amounts to most of his natural life.

Thus, even if we accept that Cirilo-Muñoz's actions and mens rea are sufficient for a conviction, it is clear that his foreknowledge of the crime was largely hypothetical, and his willing and intentional participation minimal at best. This becomes even more evident when Cirilo-Muñoz's role is compared to that of Lugo -- the perpetrator of the crime, the organizer of the scheme, and ultimately, the beneficiary of a Government-requested sentence that was effectively ten years below Cirilo-Muñoz's

sentence.  Thus, given Cirilo-Muñoz's marginal role, it is clear that a sentence of twenty-seven years is plainly unreasonable.

**B. The history and characteristics of Cirilo-Muñoz.**

The first fact to be considered is Cirilo-Muñoz's undisputed lack of any criminal record.[81]  Second, there is no evidence in the record that Cirilo-Muñoz was involved in the sale of drugs. See Cirilo-Muñoz, 404 F.3d at 528. There was incorrect information to the contrary in his first presentence report, and this information was objected to by defense counsel at his resentencing hearing.  This error was then corrected by the sentencing judge.[82]

Cirilo-Muñoz, who was eighteen years old when the incidents involved took place, lived a short distance from the Cafetín El Ideal, a neighborhood bar which was the hang-out for the young men that lived in the typical poor Puerto Rico barrio[83] of Parcelas Colón, in the Municipality of  Trujillo Alto.  They went there to play pool and purchase and drink alcoholic beverages, Mangual-Corchado, 139 F.3d at 38 n.3, although as has been described, some went there to sell drugs at the punto across the street.  Cirilo-Muñoz was a user of drugs, and like the "other

---

[81]See Presentence Report, United States v. Cirilo-Muñoz, CR-94-363 at p. 9, pt. B, (D.P.R. Dec. 28, 1995).

[82]See supra n.62.

[83]Best translated as "neighborhood."  See The Concise Oxford Spanish Dictionary 76 (1998).

young guys," a perpetual hanger-on at the Cafetín El Ideal, "spen[ding] nine hours a day, seven days a week, at El Ideal." Id. Although some of the other young men that went there caused problems in and around the El Ideal premises, Cirilo-Muñoz was not one of them.[84] The owner of El Ideal, José Adalberto Lugo-Ramírez, one of the Government's key witnesses at the trial, testified that he had known Cirilo-Muñoz during the four years he had owned that business: "He's a good guy -- good guy. He's never had any problems with me. He goes there. He makes his purchases. He doesn't make any fuss or no -- nothing disorderly, a good young man. . . . He's a -- he's a normal guy who goes to the business. He's a good young man."[85] Cirilo-Muñoz was an insignificant "groupie," which is precisely why Lugo fingered him initially, and told Agent Medina "he was the least to be feared by him and would be the least likely to be protected by the drug dealers involved," i.e., Cirilo-Muñoz was deemed expendable; he was a de facto disposable accessory, an ideal subject to take the rap for Lugo, a convenience that the Government blithely went along with. A sentence of twenty-seven years is clearly unreasonable for such a man.

---

[84]Trial Tr. at vol. III, p. 282, ll. 10-14.

[85]Id. at vol. II, p. 226, l. 24 - p. 227, l. 15.

**C. The sentence of twenty-seven years imprisonment imposed upon Cirilo-Muñoz as an aider and abettor is unreasonable because it is greater than necessary to meet the goals established by Congress, lacking both uniformity and proportionality.**

In addition to those already discussed, among the factors that Congress indicated should be considered in determining a criminal sentence are "promot[ing] respect for the law and . . . provid[ing] just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). I believe it appropriate to ask: How it can be argued that the sentencing of Cirilo-Muñoz to twenty-seven years in this case promotes respect for the law? Even if we accept the district court's conclusions -- that Cirilo-Muñoz is, at worst, a minor aider and abettor in the charges under Count 1 for which he was convicted -- it remains that the actual assassin, who was convicted not only of Count 1, but of all four counts of the indictment, and who possessed an extensive criminal record, was sentenced to only seventeen years. How can a twenty-seven year sentence imposed upon Cirilo-Muñoz for minor participation be considered a "just sentence"?

Quite the opposite, a sentence like the one in the case against Cirilo-Muñoz promotes disrespect for the law, and any semblance of justice in this outcome is purely coincidental. In fact, under the legal codes of many of the most advanced countries in the world, a manipulation of the criminal system such as has taken place in the present case is simply not permissible. See, e.g., Jenia Iontcheva Turner, Judicial Participation in Plea

-45-

Negotiations: A Comparative View, 54 Am. J. Comp. L. 199, 218 (2006) ("[P]rosecutors [in Germany] cannot make credible commitments that the court will accept a particular charge or sentence bargain."); Maximo Langer, From Legal Transplants to Legal Translations: The Globalization of Plea Bargaining and the Americanization Thesis in Criminal Procedure, 45 Harv. Int'l L.J. 1, 50 (2004) (noting that in Italy, plea-bargaining "can only be applied in cases where the sentence does not exceed five years of imprisonment after sentence reduction"); id. at 59 (noting that plea-bargaining in France may "be applied only to non-serious offenses"); see also William J. Stuntz, Plea Bargaining and Criminal Law's Disappearing Shadow, 117 Harv. L. Rev. 2548, 2567 (2001) (criticizing federal plea bargaining on the ground at the results produced in federal plea bargains are "much more likely to flow from the prosecutors' preferences than from the voters'"). Although I realize that such is not the law or practice in this country, even under our system, the outcome of the present case does little to enhance respect for the law in the eyes of the citizenship.  What the average citizen sees is a criminal who knows the ropes and, as a result, is literally getting away with murder by circumventing the system, with an insignificant clod being left holding the bag.

Even in our legal system, the cases that are reported do not support the disparity extant in this case between Cirilo-Muñoz,

a minor aider and abettor, and Lugo, the principal and murderer. I have found no reported case where an aider and abettor such as Cirilo-Muñoz was given a higher sentence than the principal. The few cases in which the principal and accessory were sentenced to the same term all have in common the fact that the accessory played a large role in the scheme. See, e.g., United States v. Harris, 167 Fed. Appx. 856, 861 (2d. Cir 2006) (unpublished opinion) (co-defendant's sentence lower where the one with the higher sentence was found to be the leader of the scheme); United States v. Harris, 397 F.3d 404, 416-17 (6th Cir. 2005) (case remanded for a hearing for a minimal participant downward departure where the aider and abettor and principal received the same sentence); see also United States v. Sitting Bear, 436 F.3d 929, 936 (8th Cir. 2006) (aider and abettor of murder of young child and the principal received the same sentence where court found that both parties "were equally culpable for the actions that led to and ultimately caused [the child's] death"); United States v. Wilson, 202 Fed. Appx. 550, 554 (3d Cir. 2006) (unpublished opinion). Clearly, the circumstances of the present case fall outside any of those cases.

## V. Conclusion

The sentence imposed upon Cirilo-Muñoz is unreasonable because, as we said in a different context, but also dealing with the concept of what is unreasonable, it is "so devoid of record support, [and] so arbitrary, as to indicate that it is outside the

universe of plausible, credible outcomes." O'Brien v. Dubois, 145 F.3d 16, 25 (1st Cir. 1998).  I am sorry to say that after having read this record from cover to cover, I am troubled by the unshakeable feeling that the sentence imposed on Cirilo-Muñoz has been fueled almost exclusively by a spirit of retribution.  The result is that justice has been truly blinded, for even if retribution were warranted, it is misdirected against Cirilo-Muñoz. An esteemed colleague in the trenches has put it cogently: "[S]entencing is about more. It is about proportionality; it requires individualizing so that the punishment fits the crime. It is not now, nor has it ever been, a one size fits all approach." Nancy Gertner, From Omnipotence to Impotence: American Judges and Sentencing, 4 Ohio St. J. Crim. L., 523, 538 (2007).

I am of the view that the sentence should be vacated and the case remanded for resentencing to the district court, at which time the reasonableness of the sentence imposed should be reconsidered, including the determination of whether Cirilo-Muñoz should be classified as a minimal participant.[86]

---

[86]It should be noted that appellant has already been incarcerated almost thirteen years.

**LIPEZ**, **Circuit Judge**.  This is an unusual case, rife with difficult issues requiring thoughtful and clear explanation. Although I do not agree with every particular of Judge Torruella's superb opinion, I agree with him that the district court's conclusory and vague explanation of the sentence imposed on Cirilo-Muñoz was inadequate as a matter of law.  I also agree with Judge Lynch that two of Cirilo's arguments — that there was insufficient evidence on which to convict him and that his sentence is unreasonable merely because it is disproportionate to the sentence imposed on co-defendant Lugo — fail.  I do not reach the question whether the district court's denial of a "minimal participant" reduction was appropriate.  In my view, the new sentencing judge should reevaluate that claim upon remand.

## I.

Before explaining my view that the district court's explanation of the sentence was insufficient, I must describe the arguments presented to the court at the sentencing hearing and the court's responses thereto.

Cirilo presented two arguments to the court at his second sentencing hearing.  First, he argued that, under the post-Booker advisory guidelines regime, a "reasonable" sentence would be one below the Guidelines Sentence Range ("GSR").  Cirilo's counsel made the following arguments to the court:

> I would argue to you that a sentence of 27 to
> 34 years is not reasonable, particularly when

-49-

you compare it to the sentence of the person who shot the officer, Mr. Lugo, who received a sentence of 22 years.

. . . .

The argument may be made, well, the reason Mr. Lugo received a smaller sentence is that he cooperated, which in fact, he did. . . .

[Lugo] testified at trial . . . . When he testified at trial, he said that my client was uninvolved. He didn't know that the officer was going to be killed, and he didn't know that the person was an officer. That's what Mr. Lugo said at trial, according to the Court of Appeals, the finding that they made.

Judge, the only way that [a cooperating witness] gets credit for his testimony is if he tells the truth. The Government, as part of the agreement says, you must agree to tell the truth and testify truthfully, or you will not be given credit for your cooperation.

So therefore, since the Government gave Mr. Lugo credit for his cooperation, they must have believed that he was telling the truth when he said that my client was uninvolved, because they gave him a huge discount from his sentence, a huge discount. . . .

I would say that under the Booker standard of reasonableness, given the testimony of the Government's own witness, and given the fact that the shooter, Mr. Lugo, got a sentence of 22 years, that my client should get a lesser sentence.

There's several ways, obviously, you can do this, Judge. You can do it simply because the guidelines are now advisory . . . .

Cirilo also argued that the district court should give him an additional two-point reduction for his level of participation. At the first sentencing hearing, the court had found that Cirilo was a "minor participant." At re-sentencing, Cirilo argued that he was more accurately classified as a "minimal

participant." Counsel repeatedly urged the court to make a minimal participant finding, which would then lower the range to twenty years and ten months, at the low end, to twenty-seven years and three months, at the upper end.

In response, the government argued that Lugo's sentence was justified by his cooperation with the prosecution. Although the government conceded that Lugo did not admit to having been the shooter when he was first interviewed, the government said that Lugo deserved significant credit for his cooperation because, despite his initial lies about who pulled the trigger, he named all of the other participants in the crime. The government went on to argue that Lugo's twenty-two year sentence was "a tough sentence" and "not a lesser or a slow [sic] sentence." After offering its justification for Lugo's sentence, no small task, the government urged the court to sentence Cirilo to thirty years, or the middle of the GSR, thereby focusing its retribution efforts on him.

The court then gave Cirilo an opportunity to make a statement, which he did:

> I ask the court to please consider and give me a new opportunity.
>     At the time I got into the case, I was a youngster, very ignorant. I have learned a lot in the time I've been jailed. And thanks to the Lord, I've had an opportunity to learn and I have matured, and I have learned my lesson.
>     I committed an error because I was with the wrong person, a mistake that I definitely will not commit again, and I would ask the Court to please give me an opportunity to redo

my life as a man, and not as a child, which is what I was.

Throughout the argument of Cirilo's counsel, the court inquired why Cirilo had followed Lugo's car and noted, more than once, that it believed that Cirilo "knew that he was following that car," suggesting that Cirilo therefore knew the full extent of the criminal activity that was underfoot. At one point, the court described Cirilo as "equally culpable of the killing." It also said that "they pushed the car down the quarry with the victim inside the car, that cannot be done. That's why [Cirilo] was found guilty of aiding and abbetting as to murder."[87] After Cirilo's statement, the court asked him why he had followed Lugo's car "where the victim here was being kidnapped?" Cirilo responded that "when they thought that they were going to give this person a beating, I never had any awareness of a death or anything, because otherwise, I wouldn't have done it, and in my very own ignorance, I wanted to see just to look, and when I came to learn about it, it was too late. I couldn't go back."

The court followed up by asking whether Cirilo had "stopped the car near the other cars," to which Cirilo replied that he had stopped the car "not so near," about "one hundred meters"

---

[87] Cirilo stated at the re-sentencing hearing, in response to questioning by the court, that when he arrived at the quarry, Lugo and the others had already pushed the car into the quarry. There was no testimony that Cirilo knew about Lugo's plans for disposal of the car (and Mejias' body), or participated in that activity.

away from Lugo's car. Cirilo also explained that by the time he arrived at the quarry, the others "were doing that. It was already done." Finally, the court asked, again, whether Cirilo followed the others "to bring them back in another car, right?" Cirilo reiterated his earlier explanation, saying "I have never said I — no." That concluded the colloquy between Cirilo and the court, and the court then proceeded to sentencing.

After summarizing the procedural history of the case, the court said:

> In this case, I find that following the advisory guidelines, the Court will impose a reasonable sentence, but will not make any variance. I can do it, but I'm not going to do it, because I don't feel that the whole affair in this case requires that I vary the sentence downward.
> Therefore, I will sentence him under the advisory guidelines and I'll give him a reasonable sentence.
> The offense of conviction, following Advisory Guideline 2A1.1 establishes a base offense level of 43.
> Because defendant was a minor participant in the instant offense, a two level reduction is warranted under Guideline Section 3B1.2(b).
> There are no other applicable advisory guideline adjustments.
> Based on a total offense level of 41 and a criminal history category of one, the imprisonment range in this case is from 324 months to 405 months with a fine range of $25,000 to $250,000, plus a supervised release term of from three to five years.
> The Court has considered the applicable guidelines adjustments under the now advisory Sentencing Guidelines, following the ruling of the Supreme Court in U.S. v. Booker, as well as the other sentencing factors set forth in

18 U.S.C. Section 3553; namely, the nature and circumstance of the offense and the defendant's history and characteristics, the need to promote respect for the law and provide just punishment in light of the seriousness of the offense; in this case, murder, deterrence, the protection of the public from further crimes of the defendant, rehabilitation, and the need to avoid unwarranted disparities among defendants with similar records convicted of similar conduct.

At this point, let me say that Defendant Lugo Sanchez was the person who knocked at the Government's door first, and that's why he made a deal; he made an agreement with the Government. He testified, and because of his testimony, these other defendants were convicted. Without that evidence, probably there would be no conviction.

So that extensive cooperation and his testimony at trial warranted that the Court agreed to the Government's Plea Agreement.

If I recall correctly, the Government wanted to give him a lower Plea Agreement, and I increased that sentence, and that should probably be in the record. There's no record of that, but I rejected the agreement when they came in with a lower sentence than I imposed on Lugo, because I considered that crime a very serious and heinous crime, a man begging for his life, had a baby of four months; he was shot in the back, in the abdomen, and then he's shot in the head. And then the individual sat on his body, and they take the car to a quarry, throw the car down with the victim.

If there's a more serious crime than that, let me know. But this defendant was a minor participant, and I have to pay obeisance to the Court of Appeals where the Court says that the evidence was thin. The Court of Appeals didn't say there was no evidence. Simply, it was thin, which means there was some evidence.

Of course, as I say, the mandate is written in stone for this Judge. I have to

follow it. I have to follow what the Court of Appeals said.

However, to be reasonable, I'm going to sentence this defendant to the lower end of the advisory guidelines.

Let me tell you, counsel, that it's going to be very difficult for a Court of Appeals or a higher court to reverse a judge when the judge sentences a defendant at the lower end of the advisory guideline. That's as reasonable as I can be.

As a matter of fact, this defendant is getting a 38-year reduction. If he lives to be 65, he would get a 43-year reduction.

I notice that he has thought about what he did; that he acknowledged the seriousness of the offense, although he didn't say he was repentant, but I take it from what he said, he's repentant of what he did.

Of course, you cannot turn the clock back. Now, at least you're alive, you have your family there with you. The child who is now fatherless, was four months old, will never have a father. The wife of the murdered police officer will never have him again, and on balance, my heart goes to the victim.

I'm not saying that I have any vindictive attitude toward you. On the contrary, I think that you are on the right path, and that's why I'm giving you the lower end.

I could have easily given you 405 months. That would be 35 years, but I'm not going to do that. I'm going to give you 324, the lower end. I find it reasonable and within the advisory guidelines, a reasonable sentence.

Therefore, it is the judgment of this Court that defendant is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 324 months. That is the lower end of the guidelines.

This is the totality of the district court's explanation of its sentence. Although the explanation seems to be lengthy, it is important to note the elements of this explanation. They

-55-

include the following: (1) a summary rejection of the request for a variance below the sentencing guidelines; (2) a summary restatement of the court's finding that the defendant was a minor participant in the offense; (3) a description of the guidelines range; (4) a summary statement that the court had considered the sentencing factors set forth in 18 U.S.C. § 3553(a); (5) a statement that Lugo's extensive cooperation with the government justified the court's acceptance of the government's plea agreement; (6) a description of the vicious murder of Mejias which prompted the court to increase the government's plea agreement;[88] (7) an acknowledgment that the court has to "pay obeisance to the court of appeals when the court says that the evidence [of Cirilo's role in the crime] was thin"; (8) a summary statement that the defendant would be sentenced to the lower end of the sentencing guidelines range; and (9) a reference to the apparent repentance of the defendant as a basis for placing the sentence at the lower end of the guidelines.  In the end, the explanation of the sentence imposed on Cirilo included only two elements: (1) a summary rejection of the request for a variance, and (2) the summary statement that a reasonable sentence would be a sentence at the lower end of the advisory guidelines in light of the apparent

---

[88] As Judge Torruella details in his opinion, the government initially recommended that Lugo be sentenced to only fifteen years of imprisonment for his role in Mejias' murder, but the district court increased the sentence to seventeen years.

repentance of the defendant.  The court gave no explicit reasons for denying Cirilo's request for a finding of "minimal participant" nor did it explain the rejection of a below-GSR sentence based on his lesser culpability.

## II.

The sentence imposed on co-defendant Lugo, the person directly responsible for the heinous murder of undercover police officer Mejias, was the result of a plea agreement.[89]  Although I principally fault the government for entering into a deal with Lugo that is grossly disproportionate to his vicious murder of Mejias, I fault the district court for failing to understand that the reasonableness of the sentence imposed on Cirilo, a minor participant at most, must be evaluated in light of the sentence imposed on Lugo, the principal player.  As a result of this failure, the district court's explanation of Cirilo's sentence is woefully inadequate.  However, before elaborating on that conclusion, I address the importance of the adequate explanation requirement.

---

[89] As noted, the district court did increase the fifteen year sentence called for by the plea agreement for the murder of a police officer to seventeen years.  In addition to the seventeen year sentence for Mejias' murder, the court also sentenced Lugo to an additional five years for aiding and abetting in the use of a firearm while committing a crime of violence.

## A. The Requirement of an Adequate Explanation

Under 18 U.S.C. § 3553(c), the sentencing judge is required to state the reasons for imposing a particular sentence "in open court" at the time of sentencing. Additionally, 18 U.S.C. § 3553(c)(1) requires the sentencing judge to state "the reason for imposing a sentence at a particular point within the range," if the GSR exceeds twenty-four months.[90]

In United States v. Jiménez-Beltre, 440 F.3d 514, 519 (1st Cir. 2006) (en banc), we described the significance of this requirement to the overall sentencing scheme, in the aftermath of United States v. Booker, 543 U.S. 220 (2005): "[O]ur emphasis in reviewing [a claim of an unreasonable sentence] will be on the provision of a reasoned explanation, a plausible outcome and — where these criteria are met — some deference to different judgments by the district judges on the scene." Jiménez-Beltre, 440 F.3d at 519. We explained that regardless of "[w]hether the sentence falls inside or outside the applicable guideline range, it is important for us to have the district court's reasons for its sentence; 18 U.S.C. § 3553(c) so requires for sentences outside the guidelines range (or within it if the range is broad) and this is even more important in the more open-ended post-Booker world." Id. We also observed that there would be some cases where the court's

---

[90] The GSR here was 324 to 405 months, a range of eighty-one months.

reasoning could be "inferred by comparing what was argued by the parties or contained in the pre-sentence report with what the judge did." Id.

We have subsequently reiterated the centrality of the explanation requirement to the overall sentencing scheme, and to our role within it. See United States v. García-Carrasquillo, 483 F.3d 124, 132 (1st Cir. 2007) ("An important prerequisite to our reasonableness analysis is the district court's reasoned explanation for the sentence imposed, as required by 18 U.S.C. § 3553(c). This is true even if the sentence is within the guidelines range." (citation omitted)).

The district court's explanation of the sentence serves dual purposes. First, the explanation is an essential prerequisite to our appellate review of the sentence. The Supreme Court has emphasized this rationale for the explanation requirement: "In the [sentencing] context, a statement of reasons is important. The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority." Rita v. United States, 127 S. Ct. 2456, 2468 (2007); see also United States v. Montes-Pineda, 445 F.3d 375, 380 (4th Cir. 2006) ("[A] district court's explanation must be elaborate enough to allow 'an appellate court to effectively review the reasonableness of the sentence.'" (quoting United States v.

Williams, 432 F.3d 621, 622 (6th Cir. 2005))).  In short, we cannot do our job of appellate review if we must guess at the reasons underlying the district court's sentence, particularly in a case with the troubling elements that we have here.

Second, such an explanation furthers the weighty goals of transparency and credibility for the justice system.  As the Third Circuit recently commented:

> The rationale by which a district court reaches a final sentence is important.  It offers the defendant, the government, the victim, and the public a window into the decision-making process and an explanation of the purposes the sentence is intended to serve.  It promotes respect for the adjudicative process, by demonstrating the serious reflection and deliberation that underlies each criminal sentence, and allows for effective appellate oversight.

United States v. Grier, 475 F.3d 556, 572 (3d Cir. 2006) (en banc).  Despite our willingness to excuse brief or summary explanations of sentences in some cases where the court's reasoning can be inferred, we should not resort to such inferences when the sentencing stakes are so high and the sentence imposed by the district court is difficult facially to understand.

I recognize the heavy workload of the district court, particularly in Puerto Rico.  The trial judges face pressures of immediacy that we do not face on the court of appeals.  Nevertheless, the sentencing decisions made by the trial judges always have enormous import for defendants, victims, and the public

at large.  Nothing they do is more important.  Given these stakes, we should not hesitate to demand an adequate explanation of a particularly difficult sentence.

With these considerations in mind, I turn to the merits of Cirilo's challenge to the sentencing explanation.[91]

## B. The Explanation

In the course of explaining its sentence, the district court stated that it would "be very difficult for a Court of Appeals or a higher court to reverse a judge when the judge sentences a defendant at the lower end of the guideline range." This statement reflects the view that sentencing is largely about the specific sentence imposed and not the rationale for it.  In the view of the district court, if the appellate court finds the number generally reasonable, the appellate court will have little concern with the underlying rationale as it relates to the particular defendant's circumstances.  This approach to sentencing is utterly

_____

[91] Several of our cases apply the plain error standard of review to a challenge to the adequacy of a § 3553(c) sentencing explanation.  Applying the plain error standard to such a challenge raises a host of difficult issues, and I have serious reservations about using that standard of review for this type of sentencing flaw.  Applying it to the facts here would be particularly troubling.  However, this is not an appropriate case for delving into the complexities that concern me.  The government has not argued for plain error review, and the parties have not briefed the issue.  Moreover, my close study of the record in this case allows me to conclude without hesitation that the error would meet the plain error test.  I therefore discuss the adequacy of the district court's explanation without applying the plain error standard.

at odds with the requirements of § 3553(c) and the important public goals served by the sentencing explanation.  See supra.

Moreover, if the district court concluded from our earlier decision that simply reducing the life sentence to a sentence at the low end of the guidelines range would satisfy all of our sentencing concerns, the district court drew the wrong conclusion.  To the contrary, given the difficult sentencing issues identified in our earlier decision, the district court could not simply invoke without explanation the sentencing factors identified in § 3553(a) and respond summarily to the specific arguments of counsel for a substantial variance from the GSR.

Cirilo's counsel argued at some length that his sentence should be lowered because of Lugo's extraordinarily light sentence.  Specifically, counsel argued "that a sentence of 27 to 34 years is not reasonable, particularly when you compare it to the sentence of the person who shot the officer, Mr. Lugo, who received a sentence of 22 years. . . . I would argue to you, it is not reasonable that a minor participant in a crime receive a sentence greater than the most responsible person for committing the crime."  In its only response to this argument, the court said that it would not depart from the GSR because it didn't "feel that the whole affair in this case requires that I vary the sentence downward."

This summary rejection of a plausible argument for a below-GSR sentence (i.e., a variance) was insufficient.  See, e.g.,

United States v. Jones, 445 F.3d 865, 872 (6th Cir. 2006) (Moore, J., dissenting) ("This court has held that meaningful reasonableness review requires that '[w]here a defendant raises a particular argument in seeking a lower sentence, the record must reflect both that the district judge considered the defendant's argument and that the judge explained the basis for rejecting it.'" (quoting United States v. Richardson, 437 F.3d 550, 554 (6th Cir. 2006))). That the court selected a sentence at the bottom of the GSR does not explain why it declined to grant Cirilo a variance. A guidelines sentence is never automatically reasonable; in this Circuit it is not even presumptively reasonable. See Jiménez-Beltre, 440 F.3d at 518. Selection of a sentence within the GSR, therefore, did not eliminate or alter the statutory requirement that the court provide an explanation that complies with § 3553(c).

Such compliance is particularly critical because of the disparity issue at the heart of this sentencing appeal. Cirilo plausibly argues that Lugo's sentence creates a "drag" on the length of a "reasonable" sentence that may be imposed on him when his culpability for this murder is so much less than Lugo's, the man who responded to the victim's pleas for mercy by shooting him in the stomach and then in the head at close range. It is true, as we have often noted, that a co-defendant who was found guilty by a jury is not "similarly situated" to a co-defendant who pled guilty, and thus the disparity between them is not the intended target of

-63-

18 U.S.C. § 3553(a)(6)[92] — a provision primarily focused on mitigation of national disparities between similarly situated defendants. See, e.g., United States v. Taylor, ___ F.3d ___, No. 06-2216, 2007 WL 2349415 (1st Cir. 2007); United States v. Thurston, 456 F.3d 211, 216 (1st Cir. 2006); Navedo-Concepción, 450 F.3d at 59 ("Congress's concern with disparities was mainly national."). Nonetheless, post-Booker, gross disparities between co-defendants remain a permissible consideration in certain cases, even if it is not the primary goal of the statutory provision. See United States v. Vázquez-Rivera, 470 F.3d 443, 449 (1st Cir. 2006) ("[A] district court may consider disparities among co-defendants in determining a sentence . . . ."); see also United States v. Wills, 476 F.3d 103, 110 (2d Cir. 2007) ("We do not, as a general matter, object to district courts' consideration of similarities and differences among co-defendants when imposing a sentence."); United States v. Krutsinger, 449 F.3d 827, 829-30 (8th Cir. 2006); United States v. Parker, 462 F.3d 273, 277 (3d Cir. 2006) (holding that a district court is permitted, although not required, to consider sentencing disparities among co-defendants).[93]  Cirilo

---

[92] Section 3553(a)(6) says that a sentencing court should consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

[93]  In at least one case, a sentence has been vacated because of the disparity between the defendant and her less-culpable co-defendants. United States v. Lazenby, 439 F.3d 928, 933 (8th Cir. 2006).

based a significant part of his argument at sentencing on the disparity issue and the anomaly that Lugo, with his far greater culpability for the crime, received a lesser sentence. The district court had an obligation to respond to that argument with a supportable rationale. It failed to do so.

Instead, the district court focused almost entirely on the rationale for Lugo's sentence: his cooperation with and testimony for the prosecution. The court went so far as to say that "without [Lugo's testimony], probably there would be no conviction," without explaining why or how Lugo's cooperation was not merely helpful but necessary to the government's case against the other co-defendants. Lugo was entitled to some credit for his cooperation with the government, even though he lied during his first two interviews with the FBI. But the district court's focus on Lugo's cooperation was too exclusive. Other than a general invocation of the § 3553(a) factors, the court said virtually nothing about them.[94] See United States v. Frabizio, 459 F.3d 80, 91 (1st. Cir. 2006) (stating that a court abuses its discretion

---

[94] Section 3553(a) requires a sentencing court to consider the following factors: the nature and circumstances of the offense and the history and characteristics of the defendant; the seriousness of the offense; the need to promote respect for the law; provision of just punishment for the offense; deterrence of criminal conduct; protection of the public from further crimes of the defendant; educational or vocational training for the defendant; the kinds of sentences available; the sentencing guidelines range; any pertinent policy statements; disparities between similarly situated defendants; and the need to provide restitution to any victims of the offense.

"'when a relevant factor deserving of significant weight is overlooked, or when an improper factor is accorded significant weight, or when the court considers the appropriate mix of factors, but commits a palpable error of judgment in calibrating the decisional scales'" (quoting United States v. Gilbert, 229 F.3d 15, 21 (1st Cir. 2000))); see also Taylor, __ F.3d __, 2007 WL 2349415, at *3 (noting that reasonableness review of sentences, under Booker, is "not easily distinguishable from review for abuse of discretion"). The district court could not reasonably explain Cirilo's twenty-seven year sentence simply by invoking Lugo's cooperation.

To be sure, there was another factor driving the court's sentencing decision on Cirilo, and hence its rejection of any variance from the GSR — the court's view that Cirilo understood the full extent of the criminal enterprise, and therefore was substantially culpable for the murder. The court repeatedly asked Cirilo (and his counsel) why he had followed Lugo's car if he did not know that a murder was imminent, and he clearly did not believe Cirilo's explanation that he was following because he was curious and wanted to see Mejias beaten up. Cirilo pointed to specific evidence — namely, Lugo's testimony — in support of his argument that he did not know, when he followed Lugo's car, what was about to occur. But the court never explained why it rejected Cirilo's own testimony, which was consistent with Lugo's testimony at

-66-

trial.[95]  Indeed, Cirilo's counsel emphasized to the court that Lugo's plea deal was contingent on his truthful testimony at trial. Yet the district court failed to explain why it did not credit Lugo's testimony regarding Cirilo's culpability, despite the government's apparent belief that Lugo upheld his obligation to testify truthfully.  Much like the original sentencing hearing, when the court found that Cirilo knew that Mejias was a police officer, the court arrived at certain conclusions about Cirilo's culpability without explaining the evidence that supported them.

Given the troubling history of this case and the equally troubling disparity at the heart of this appeal, it should have been clear to the district court that more was required on remand than the unsupported assertion that a sentence at the bottom of the guidelines range was almost surely reasonable.  The district court's failure to recognize this imperative resulted in a sentencing explanation that included the summary rejection of Cirilo's request for a variance, the generalized invocation of the § 3553(a) sentencing factors, the excessive focus on Lugo's cooperation, and the unsupported conclusions about Cirilo's culpability.  This sentencing explanation failed to comply with the requirements of § 3553(c) because it compromises our ability to conduct proper appellate review of the sentence and it fails to

---

[95] Lugo testified that he did not know why Cirilo had followed him and that he did not ask Cirilo to do so.

meet the overarching public goals of the adequate sentencing explanation — transparency and credibility.

As the Second Circuit eloquently said:

> To paraphrase Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 572 (1980), people in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they have insufficient information to understand. When a statement of reasons is given, there is at least an opportunity for understanding both the system in general and its workings in the particular case. We have held, for similar reasons, that the public has a presumptive right of access to sentencing proceedings. The requirement that a statement of reasons be given is hardly, as the government would have it, a mere "formalism."

United States v. Lewis, 424 F.3d 239, 247 (2d Cir. 2005). The Supreme Court's recent opinion in Rita further underscores the importance of public explanation and justification of a sentencing decision. The Court stated that "[c]onfidence in a judge's use of reason underlies the public trust in the judicial institution. A public statement of those reasons helps provide the public with the assurance that creates that trust." Rita, 127 S. Ct. at 2468.

Any observer of this case would not feel the assurance that creates such trust. By his own admission, Lugo concocted the plan to kill Mejias and carefully executed that plan. He testified that Cirilo had no knowledge of the plan. Despite his ultimate cooperation with authorities, Lugo initially lied to investigators and claimed that Cirilo was the murderer, later explaining that he

-68-

had pinned the crime on Cirilo because Cirilo was, essentially, the "lowest man on the totem pole." Nonetheless, Lugo has been sentenced to serve only seventeen years for his role in this grisly murder and Cirilo, whose role was decidedly more minor, has been sentenced to twenty-seven years. While some of that disparity is explained by Lugo's plea of guilty and cooperation with the government, Cirilo's sentence remains difficult to comprehend. The only remedy for that difficulty, grounded as it is in the court's failure to provide the adequate sentencing explanation required by § 3553(c), is a remand for resentencing.[96]

---

[96] The resentencing will necessarily take place before a different judge. The sentencing judge has now retired.

**LYNCH**, <u>**Circuit Judge, dissenting as to the remand**</u>.  In 1995, defendant Ernesto Cirilo-Muñoz was convicted of aiding and abetting the murder of an on-duty police officer during the commission of a drug offense.  Cirilo drove the getaway car for his co-defendants, who murdered Ivan Mejias Hernandez, an undercover police officer posing as a drug customer.  Cirilo was sentenced to twenty-seven years in prison.  The murderer cooperated with the government and received a twenty-two year sentence, seventeen of which were for this murder.

Cirilo now appeals his sentence on four grounds.  I state my views on each.

## I.

More detailed descriptions of the facts may be found in our previous opinions pertaining to Cirilo's conviction and initial sentence.  <u>See</u> <u>Cirilo-Muñoz</u> v. <u>United States</u>, 404 F.3d 527, 528-29 (1st Cir. 2005); <u>United States</u> v. <u>Mangual-Corchado</u>, 139 F.3d 34, 37-41 (1st Cir. 1998).  My view of what the record establishes varies a bit from that of my colleagues.

Saul Mangual Corchado, Jose Lugo Sanchez, and David Silva sold drugs, including marijuana, cocaine, and heroin, at a drug point outside Cafetín El Ideal in Trujillo Alto, Puerto Rico.  Cirilo frequented El Ideal, and El Ideal's owner testified that he was "almost always" with Mangual and Lugo.  There was no evidence that Cirilo himself sold drugs.

Lugo correctly suspected that Mejias, who was a regular drug customer, was an undercover police officer. Lugo told one of his suppliers -- a man known as "Chispo" -- as much, and in October 1994, Chispo ordered Lugo to kill Mejias. Lugo then told Luis Antonio Ramirez Ynoa that Chispo had ordered Lugo to kill Mejias. Lugo testified at trial that he did not tell Cirilo of the order.

In the early afternoon of November 1, 1994, Lugo, Silva, Ramirez, Mejias, and Cirilo, among others, were present at the El Ideal drug point. Lugo walked with Mejias to the stoop of a nearby building, where he accused Mejias of being an informant. Silva and Ramirez then approached the stoop, and Lugo went to retrieve a revolver from a car parked in front of El Ideal. Lugo concealed the gun, and upon walking back towards El Ideal, Lugo encountered Mangual, Cirilo, and Yito Morales (another drug supplier), all of whom he encouraged to beat up Mejias. Mangual, Cirilo, and Morales declined, and Lugo then returned to the stoop, where he had left Ramirez, Silva, and Mejias. The evidence was unclear as to whether Cirilo accompanied Lugo to the stoop.

Once back at the stoop, Lugo ordered Mejias at gunpoint to surrender the keys to his car, a Suzuki parked in front of El Ideal. Ramirez and Mangual retrieved Mejias's gun from his car while Cirilo looked on from a vantage point near the car. Lugo then escorted Mejias back to the Suzuki, where Mejias retrieved his keys, and Lugo instructed Mejias to get in the Suzuki and "not

-71-

. . . come around there anymore."  However, as Mejias was about to leave, another man, identified as "Papilin," told Lugo that he had to kill Mejias or otherwise Mejias might come back.  There was no direct evidence that Cirilo heard this comment, and the evidence as to where Cirilo was standing in relation to Papilin and Lugo was unclear.

At that point, Lugo ordered Mejias, again at gunpoint, to get out of the driver's seat and into the back seat of the Suzuki. Lugo got in the back seat with Mejias, and Mangual got into the driver's seat.  Mangual then drove out of the parking lot and on to the highway.  Cirilo and Ramirez followed in another car.  Shortly after leaving El Ideal, Lugo shot Mejias in the abdomen and in the head.  Thereafter, the cars stopped at a cemetery, where Ramirez shot Mejias twice more in the head and then got into the passenger seat of the Suzuki.  Lugo got into the other car with Cirilo, and both cars traveled to a quarry, where Mangual and Ramirez attempted to push the Suzuki, containing Mejias's body, into the quarry.  The car became suspended, and the four men left the quarry in the car driven by Cirilo.  Later, they split $240 that Lugo had taken from Mejias's body.

Mangual, Ramirez, Lugo, and Cirilo were later arrested and indicted for aiding and abetting the murder of an on-duty police officer in relation to a felony drug offense, 21 U.S.C. § 848(e)(1)(B); 18 U.S.C. § 2, carjacking, 18 U.S.C. § 2119, and

using a firearm during the commission of a crime of violence, namely the carjacking, id. § 924(c). Lugo entered into a plea agreement with the government and testified against Mangual, Ramirez, and Cirilo at trial. In September 1995, Cirilo was convicted of aiding and abetting the Mejias murder, but acquitted of the carjacking and firearms charges.[97] He was sentenced to life in prison.

Cirilo appealed his conviction, arguing that the evidence was insufficient to establish the aiding and abetting offense, and the conviction was affirmed. Mangual-Corchado, 139 F.3d at 44-49. His petition for certiorari was denied. Cirilo-Munoz v. United States, 525 U.S. 942 (1998).

Cirilo then filed a petition for post-conviction relief under 28 U.S.C. § 2255. One of the issues raised in the petition involved the district court's application of a sentencing enhancement based on its finding that Mejias's murder was motivated by the fact that he was a police officer. Cirilo's counsel had failed to challenge the application of this enhancement on direct appeal, despite the fact that it increased Cirilo's Guidelines range from 27-34 years to life imprisonment. The district court denied the § 2255 petition, but on appeal this court held that Cirilo's counsel had been constitutionally ineffective in failing

---

[97] Mangual and Ramirez were convicted on all three counts and were sentenced to life in prison.

to raise the issue.  Cirilo-Muñoz, 404 F.3d at 531-32.  We vacated Cirilo's sentence and remanded the case to the district court for re-sentencing.  Id. at 532.

On remand, with Booker in mind, the district court first calculated the range of sentences recommended under the Guidelines, taking into account a two-level reduction for Cirilo's minor role. The judge concluded that a sentence within that range was reasonable, noting that he had considered the factors listed in 18 U.S.C. § 3553 and discussing specifically the seriousness of the crime as well as Cirilo's good behavior in prison and his repentance.  In response to arguments raised by Cirilo and repeated here, the judge pointed out that the thinness of evidence against Cirilo did not change the fact that he had been convicted of aiding and abetting, and he explained that Lugo's more lenient sentence resulted from his plea agreement and cooperation with the government.  Although the government had recommended a sentence of 360 months, the judge sentenced Cirilo to 324 months (twenty-seven years) of imprisonment, the lowest sentence under the Guidelines, in addition to four years of supervised release and a special monetary assessment of $50.00.

## II.

On appeal, Cirilo raises four claims of error.  He first claims that there was a Guidelines error.  Cirilo argues that the district court should have reduced his base offense level by four

levels, rather than by two, because he played only a minimal role in the offense and was not a minor participant, as the court found. See U.S.S.G. § 3B1.2.  Second, Cirilo argues that he was sentenced for a crime of which he was innocent, and, despite his conviction, that this violated his Eighth Amendment right against cruel and unusual punishment.  Third, Cirilo argues that his sentence is unreasonable merely because it is disproportionate to the sentence received by Lugo, who shot Mejias.  Finally, Cirilo argues that the district court failed to explain adequately how it arrived at his sentence.  See United States v. Jiménez-Beltre, 440 F.3d 514, 519 (1st Cir. 2006) (en banc), cert. denied, 127 S. Ct. 928 (2007). All four arguments are without merit.

A.      Claimed Guidelines Error

At Cirilo's re-sentencing hearing, the district court determined that Cirilo had played a minor role in the offense and accordingly was entitled to a two-level reduction in his base offense level.  See U.S.S.G. § 3B1.2(b).  Cirilo argues that this was not enough: the district court should instead have reduced his base offense level by four levels because the evidence showed that he was only a minimal participant in the offense.[98]  See id.

_____

[98]  Cirilo also attempts to characterize his claim as a due process claim.  He briefly remarks that the district court based its determination that Cirilo was a minor participant solely on the fact that he was convicted of aiding and abetting, rather than on the underlying facts of the case, and that this violated his due process rights.  This argument is waived.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in

-75-

§ 3B1.2(a). The claimed error is not purely one of law, but of the district court's application of the law to the facts. We review the district court's factbound determination for clear error. United States v. Downs-Moses, 329 F.3d 253, 266 (1st Cir. 2003); United States v. Wright, 873 F.2d 437, 443-44 (1st Cir. 1989). As long as the district court's determination is based on reasonable inferences drawn from adequately supported facts, this court will not find clear error. United States v. Santos, 357 F.3d 136, 142 (1st Cir. 2004).

The Sentencing Guidelines provide for offense-level adjustments for a defendant whose degree of participation in the offense lessens his culpability. A minor participant may be awarded a two-level reduction of his base offense level, while a minimal participant may be awarded a four-level reduction.[99] U.S.S.G. § 3B1.2. "The difference between a minimal and a minor

---

a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

In any event, the district court considered the facts of the case and there was no due process violation here. The court's statement that Cirilo was convicted of aiding and abetting and therefore was "equally culpable" seems to have come in response to an attack on the strength of Cirilo's conviction, not as a justification for denying Cirilo's request to consider him a minimal participant. Indeed, the court did not hold Cirilo equally culpable, and instead found him to be less culpable than his co-defendants and therefore entitled to a two-level reduction.

[99] The Guidelines also provide for a three-level reduction when a defendant's role falls between minor and minimal participation. U.S.S.G. § 3B1.2. Cirilo has not argued that he was entitled to a three-level reduction.

participant is a difference of degree, not kind." Santos, 357 F.3d at 142.

To qualify as a minor participant, a defendant must demonstrate that he is less culpable than those with whom he acted and less culpable than the majority of those who participate in similar crimes. Id. To qualify as a minimal participant, a defendant must show that "he is substantially less culpable than his cohorts in the actual offense and that he is substantially less culpable than the vast majority of those taking part in similar crimes. In short, a defendant must be a plainly peripheral player to justify his classification as a minimal participant." Id. (citation omitted). A lack of knowledge or understanding of the extent of a criminal enterprise or the activities of others indicates minimal participation. U.S.S.G. § 3B1.2 cmt. n.4.

Still, being the least culpable defendant in a criminal conspiracy does not automatically make one a minimal participant: rather, the minimal participant designation is reserved for the rare case. Id.; see also, e.g., Santos, 357 F.3d at 142 (minimal participant standard so hard to meet that it will apply only rarely); Downs-Moses, 329 F.3d at 266 (similar); United States v. Munoz, 36 F.3d 1229, 1238 (1st Cir. 1994) (similar); United States v. Jurado-Lopez, 338 F. Supp. 2d 246, 252 (D. Mass. 2004) (refusing to grant minimal role adjustment to woman threatened and physically forced into being a drug mule, given that the minimal role

adjustment is meant to be used infrequently). Further, if Cirilo were considered a minimal participant, his twenty-seven-year sentence would still fall within the applicable Guidelines range.

Cirilo argues primarily that he was a minimal participant because he lacked knowledge of the scope of the criminal enterprise -- that is, he claims that he was unaware that Lugo intended to kill Mejias. That argument is foreclosed by the jury verdict, which required a finding of foreknowledge. United States v. Rostoff, 53 F.3d 398, 413 (1st Cir. 1995) (judge cannot sentence defendants based on determinations that contradict facts implicit in jury verdict); United States v. Weston, 960 F.2d 212, 218 (1st Cir. 1992), abrogated on other grounds by Stinson v. United States, 508 U.S. 36 (1993) ("[A] guilty verdict, not set aside, binds the sentencing court to accept the facts necessarily implicit in the verdict.").

This court upheld that verdict, affirming the jury's finding that Cirilo shared Lugo's intent to kill Mejias. See Mangual-Corchado, 139 F.3d at 44-49. We cannot reconsider here whether Cirilo had knowledge of the extent of the criminal enterprise.[100]

---

[100] Cirilo also -- very briefly -- makes a more generalized attack on the district court's finding that he was a minor, but not minimal, participant. He notes that he did not heed Lugo's call to beat up Mejias, that he did not urge others to participate in the murder, that he was acquitted of the carjacking counts, and that he was uninvolved in the drug transactions taking place at El Ideal. Although there was no evidence that Cirilo sold drugs, there was

The district court did not clearly err in its determination that Cirilo was a minor, but not a minimal, participant. At the initial sentencing hearing, the court canvassed the evidence in the case and noted that the evidence indicated, inter alia, that Cirilo was aware of the plan to kill Mejias, that he drove Lugo to the quarry and drove his co-defendants away from the quarry after the car had been pushed over the embankment, and that he shared in the money that was taken off of Mejias's body. The district court then explained its reasons for finding that Cirilo was a minor participant in the offense. The court stated, "[B]ecause he didn't kill the victim, because he didn't try to dump the car into the . . . embankment and . . . he was . . . driving the getaway car, he stayed behind, I'm going to give him a minor participant, but I'm not going to give him a minimal because he doesn't qualify as a minimal."

At re-sentencing, Cirilo's counsel asked the court to reconsider Cirilo's role based on his supposed lack of knowledge. After hearing counsel's argument, the court again determined that Cirilo was a minor participant entitled to a two-level reduction. The court did not at re-sentencing reiterate its earlier given reasons for applying the minor participant reduction, nor did it

_____

evidence in the record that he bought drugs from Chispo and that he used drugs provided by Lugo after Mejias had initially been shot.

Cirilo also equates the weight of the evidence against him with his degree of participation in the crime. These simply are not the same.

-79-

need to do so.  Cf. Jiménez-Beltre, 440 F.3d at 519 ("[A] court's reasoning can often be inferred by comparing what was argued by the parties or contained in the pre-sentence report with what the judge did.").

Based on the record, there is no clear error in the denial of a minimal participant reduction.  Even viewing Cirilo's argument for a reduction as going beyond the issue of his knowledge, the argument still fails.  The record shows that Cirilo drove the car that allowed the other participants in the crime to make a clean getaway.  It is not clear error to infer that Cirilo's co-defendants would not have driven out to the quarry to dispose of Mejias's body and car if they had not known that they had a means by which to leave the scene.  It was not clear error to conclude that Lugo and Ramirez valued Cirilo's participation significantly.  When they lost sight of Cirilo's car behind them, they doubled back along the road until they came upon him, at which point the cars continued on together.  Likewise, the evidence was that Cirilo shared equally in the proceeds of the murder.  The district court's determination that Cirilo was not merely a peripheral player was not clearly erroneous.

B.        Excessive Punishment

Cirilo argues that he is innocent, and that as a result his sentence violates the Eighth Amendment's prohibition on cruel and unusual punishment.

We have already rejected the claim of innocence. Mangual-Corchado, 139 F.3d at 49. Nonetheless, we discuss Cirilo's two claims of error because they independently are based on flawed legal premises. Cirilo first argues that he did not aid and abet in Mejias's killing in connection with a felony violation of Title II or III of the Controlled Substances Act, Pub. L. No. 91-513, 84 Stat. 1242 (1970), as required by 21 U.S.C. § 848(e)(1)(B). In support of this argument, Cirilo notes that he was acquitted of both the carjacking and firearms offenses with which he was charged. Second, Cirilo argues that he was not engaged in any continuing criminal enterprise, and that such engagement is required for conviction under 21 U.S.C. § 848. Cirilo bases this argument on the fact that the title of § 848 is "Continuing Criminal Enterprise."

Both strands of Cirilo's argument are flawed. To begin, § 848(e)(1)(B) does not require the principal to have been engaged in a continuing criminal enterprise. Rather, § 848(e)(1)(B) defines a separate crime -- the killing of a law enforcement officer in relation to felony violation of federal drug laws -- from that established in § 848(a)-(c). See United States v. NJB, 104 F.3d 630, 633-35 (4th Cir. 1997); United States v. Villarreal, 963 F.2d 725, 727-28 (5th Cir. 1992) ("[Section] 848(e) . . . added a death penalty provision, not for CCE offenses, but for an entirely new group of offenses -- intentional murders committed

during certain specified felonies." (emphasis added)). Likewise, the carjacking crimes to which Cirilo refers are irrelevant to conviction under § 848(e)(1)(B), which criminalizes the killing of a law enforcement officer in connection with certain specified narcotics felonies.

As to Cirilo's first argument, there was ample evidence that the killing of Mejias was in relation to the violation of federal narcotics laws. Lugo suspected that Mejias was an informant, and Lugo killed Mejias to protect himself and others from being apprehended as drug dealers. That there was no evidence in the record that Cirilo himself engaged in drug dealing (but was merely a purchaser of drugs) is irrelevant. As the judge properly instructed the jury, a conviction for aiding and abetting does not require that the defendant have engaged in every act constituting the substantive offense, but rather only that some person have done so, and that the defendant have participated voluntarily in the commission of the crime with the requisite intent to violate the law. See United States v. Henderson, 320 F.3d 92, 109-10 (1st Cir. 2003); see also United States v. Moran, 312 F.3d 480, 494 (1st Cir. 2002).

C.      Fact of Sentence Disparity with Lugo

Cirilo argues that the fact that Lugo was sentenced to seventeen years in prison (plus another five years for another crime), while Cirilo received a twenty-seven-year sentence of

imprisonment, standing alone establishes unreasonableness.  He

makes subsidiary arguments that the district court, in discussing

the differential between his and Lugo's sentences, relied on facts

not found by a jury or admitted by him, and that this violated his

Sixth Amendment right to confront witnesses against him.

A claim that a sentence is unreasonable because it is

disproportionate to the sentence of a co-defendant is reviewable

post-Booker.  See Jiménez-Beltre, 440 F.3d at 517; see also, e.g.,

United States v. Pierre, 484 F.3d 75, 89-90 (1st Cir. 2007); United

States v. Vázquez-Rivera, 470 F.3d 443, 449 (1st Cir. 2006), cert.

denied, 127 S. Ct. 2951 (2007); United States v. Saez, 444 F.3d 15,

17 (1st Cir. 2006), cert. denied, 127 S. Ct. 224 (2006).

Our main concern with disproportionate sentences is with

disparities between the defendant's sentence and sentences imposed

nationally on defendants in the same circumstances.  United States

v. Mueffelman, 470 F.3d 33, 40 (1st Cir. 2006).  Normally, a

sentence within the Guidelines range, as Cirilo's sentence was,

likely reflects the national norm.  Id. at 40-41.  "[A] defendant

is not entitled to a lighter sentence merely because his co-

defendants received lighter sentences," United States v. Gomez-

Pabon, 911 F.2d 847, 862 (1st Cir. 1990), although concerns could

arise if two "identically situated defendants" received different

sentences from the same judge, Mueffelman, 470 F.3d at 41.

Lugo and Cirilo were not identically situated. Lugo had cooperated with the government and testified at trial. We have noted many times that "[a]lthough a district court may consider disparities among co-defendants in determining a sentence, [a defendant's] sentence [is not] unreasonable simply because his co-defendant[] agreed to help the government in exchange for [a] reduced sentence[]." Vázquez-Rivera, 470 F.3d at 449; see also Saez, 444 F.3d at 18; accord United States v. Caine, 487 F.3d 1108 (8th Cir. 2007) (upholding as reasonable a sentence twice as long as that received by an allegedly more culpable codefendant where codefendant cooperated and testified for the government); United States v. Ramirez, 221 Fed. Appx. 883, 887-88 (11th Cir. 2007) (upholding as reasonable a sixteen-year sentence for a peripheral participant with no criminal history, even though a more central player received a seven-year sentence, where the more central player had assisted the government's investigation); United States v. Boscarino, 437 F.3d 634 (7th Cir. 2006), cert. denied, 127 U.S. 3041 (2007) (upholding as reasonable a sentence longer than that imposed on codefendant, even though codefendant's Guidelines range was higher, where that codefendant had cooperated with the government). Similarly, we have repeatedly found that reduced sentences for those who plead guilty do not render unreasonable longer sentences for less culpable defendants who continue to trial. See United States v. Martínez-Vives, 475 F.3d 48, 55-56

(1st Cir. 2007) (upholding as reasonable a longer sentence than that imposed on a more culpable defendant where the more culpable defendant pleaded guilty); United States v. Navedo-Concepción, 450 F.3d 54, 60 (1st Cir. 2006) (affirming 151-month sentence for defendant even though leader of the conspiracy who pleaded guilty received a 63-month sentence); cf. United States v. Thurston, 456 F.3d 211, 216, 220 (1st Cir. 2006), pet. for cert. filed, 75 U.S.L.W. 3121 (Sept. 14, 2006) (No. 06-378) (requiring a minimum sentence of three years for defendant even though his cohort, who pled guilty, received only probation).  "[W]here the defendant's own sentence has been justified and the basis for a co-defendant's lesser sentence is set forth or is apparent, no more precise calibration of the difference between them is customarily feasible, let alone required." Mueffelman, 470 F.3d at 41.

D.        Explanation of Reasons for Sentencing Disparity

Cirilo argues that the district court did not adequately consider the sentencing factors laid out in 18 U.S.C. § 3553(a).[101]

---

[101]    Cirilo mentions his "success in prison" as a factor that should have been considered by the court.  This argument goes nowhere.

He also makes an incoherent Confrontation Clause claim.  As Cirilo concedes, the Sixth Amendment confrontation right does not attach at sentencing. United States v. Rodríguez, 336 F.3d 67, 71 (1st Cir. 2003); see also United States v. Luciano, 414 F.3d 174, 179 (1st Cir. 2005).  In a variation on a theme, Cirilo argues that his case "warrants . . . special prophylaxis" because the evidence against him was thin and Lugo testified that Cirilo was innocent. See United States v. Tardiff, 969 F.2d 1283, 1287 (1st Cir. 1992).  We reject this argument. See Manqual-Corchado, 139 F.3d at 46 n.26 (discussing the import of Lugo's testimony regarding Cirilo's

-85-

Cirilo's argument is focused on the district court's explanation of its reasons for sentencing him to twenty-seven years' imprisonment. See Jiménez-Beltre, 440 F.3d at 519; see also 18 U.S.C. § 3553(c).

In Jiménez-Beltre, this court emphasized the importance of having a reasoned explanation of a district court's decision to impose a particular sentence. 440 F.3d at 519; see also United States v. García-Carrasquillo, 483 F.3d 124, 132 (1st Cir. 2007) ("An important prerequisite to our reasonableness analysis is the district court's reasoned explanation for the sentence imposed . . . ."); Vázquez-Rivera, 470 F.3d at 448.

The district court adequately explained its reasons for imposing a twenty-seven-year sentence here. The court discussed in detail the seriousness of the substantive offense and noted that because the crime was so serious, it was disinclined to sentence Cirilo below the Guidelines range.[102] It addressed the sentencing disparity by emphasizing Lugo's cooperation,[103] and it noted that

knowledge).

[102] "I considered that crime a very serious and heinous crime, a man begging for his life, had a baby of four months; he was shot in the back, in the abdomen, and then he's shot in the head. . . . If there's a more serious crime than that, let me know."

[103] "At this point, let me say that Defendant Lugo Sanchez was the person who knocked at the Government's door first, and that's why he made a deal . . . . [B]ecause of his testimony, these other defendants were convicted. . . . So that extensive cooperation and his testimony at trial warranted that the Court agreed to the Government's Plea Agreement."

Lugo had been sentenced to a longer term than the government had in fact requested. The court also explained its decision to sentence Cirilo at the low end of the Guidelines range: The court noted that Cirilo had thought about his behavior, had acknowledged the seriousness of the offense, and seemed to be repentant. In addition, the court discussed its belief that Cirilo was using his time in custody well and could become a useful citizen.[104] The district court did consider a range of factors, and in weighing them, it did not reach an inherently unreasonable result. See, e.g., United States v. Shelton, 490 F.3d 74, 80 (1st Cir. 2007), pet. for cert. filed, (June 27, 2007) (No. 07-5041) (upholding as reasonable a sentence at the bottom of the applicable Guidelines range despite defendant's diminished capacity and tragic history); Ramirez, 221 Fed. Appx. at 888 (sentencing minor peripheral participant with no criminal history to bottom of Guidelines range is not "out of the 'range of reasonable sentences from which the district court may choose'" (quoting United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005))).

The majority argues that the explanation given by the sentencing judge is inadequate as to why he did not further reduce

---

[104] "I think that you are on the right path, and that's why I'm giving you the lower end. . . . I notice you have received some awards, and you have learned English. . . . So that speaks highly of you. I hope that I am not wrong when I predict that you will be a useful citizen and that you will not let your family, nor the Court down when you come back."

defendant's sentence in light of the sentence Lugo obtained. Like my colleagues, I am concerned that Lugo may have received too lenient a sentence. Unlike my colleagues, I do not consider that this provides a basis for requiring further explanation than already given for not further reducing defendant's sentence. It is self-evident that one lenient sentence to a pleading and cooperating co-defendant cannot be permitted to create a downward spiral in sentences. Such a spiral itself would undermine public trust and confidence, as well as the interest in national uniformity in sentencing. Cirilo was fairly sentenced at the low end of the Guidelines range, and the court explained its reasons for going no lower. The offense here is very serious: an undercover agent and father of a young family was murdered while he pleaded for his life. In light of that seriousness, the leniency already shown, and the explanation given, I doubt whether there is even a "colorable argument that the sentence is unreasonably severe." United States v. Gammicchia, ___ F.3d ___, 2007 WL 2265134 at *3 (7th Cir. Aug. 9, 2007).

I do not begrudge my colleagues their desire for a fuller explanation; I just disagree that one is required.